**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

U.L. COLEMAN COMPANY, LTD,                     CIVIL ACTION NO. 08-2011
SEQUOIA VENTURE NO. 2, LTD, AND
A. TEAGUE PARKWAY, LLC

VERSUS                                         JUDGE S. MAURICE HICKS, JR.

BOSSIER CITY-PARISH METROPOLITAN               MAGISTRATE JUDGE HORNSBY
PLANNING COMMISSION, OFFICE OF
PERMITS AND INSPECTIONS FOR THE
CITY OF BOSSIER, AND THE CITY
COUNCIL OF BOSSIER CITY

**MEMORANDUM RULING**

On February 2-5, 2009, the above-captioned matter came on for an evidentiary hearing in relation to the Motion for Preliminary Injunction (Record Document 2) filed by the Plaintiffs, U.L. Coleman Company, Ltd, Sequoia Venture No. 2, Ltd, and A. Teague Parkway, LLC (hereinafter referred to as "the Plaintiffs"). Thereafter, the parties submitted post-hearing briefs. Having read the briefs submitted by the parties and having heard the evidence and arguments presented, the Court makes the following findings of fact and conclusions of law.

**I.      FINDINGS OF FACT.**

In drafting these preliminary findings of fact, the Court relied upon the Complaint, Motion for Preliminary Injunction, the briefs filed by the parties, and the evidence presented during the four day evidentiary hearing on the Plaintiffs' Motion for Preliminary Injunction. All factual disputes were resolved in favor of the Plaintiffs and the Court assumed all facts alleged by the Plaintiffs to be true. However, the findings of facts made by the Court with regard to the preliminary injunction proceeding are not binding at a later trial on the merits.

See Univ. of Tex. v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834 (1981).

## A.     The Bossier City-Parish, Louisiana Unified Development Code ("UDC").

The UDC[1] was adopted by the City of Bossier City Council ("the City Council") and became effective for the City of Bossier City ("the City") on January 1, 2004.  See Exhibit P-65 at 5.[2]  The UDC governs all land development within the incorporated areas of the City.  See id. at 6.

Section 2.4.1(B) of the UDC provides that the Bossier City-Parish Metropolitan Planning Commission ("the MPC") shall consist of seven members.  Id. at 10.  The Executive Director serves as Staff to the City Council, the MPC, and the Zoning Board of Adjustment.  See id. Section 2.5.1 at 15.  Pursuant to Section 17.2.1, "[t]he responsibility for the enforcement of [the UDC] is delegated to the Executive Director."  Id. at 228.  The Executive Director's authority and duties include administering and enforcing the provisions of the UDC; providing written interpretations of the UDC; and reviewing and making recommendations to the MPC in regards to Planned Unit Development ("PUD") requests. See id., Section 2.5.3 at 15.  The Executive Director is further authorized under the UDC to take action the following action:

> If the Executive Director shall find that any of the provisions of this Code are being or have been violated, he/she shall notify in writing the person responsible for such violations, setting forth the nature of the violation and order the action necessary to correct it.

Id., Section 17.2.2 at 228.  The Executive Director may also issue stop orders against any

---

[1]The UDC is encompassed as part of the Bossier City Code of Ordinances.

[2]Unless otherwise indicated, all exhibits refer to those submitted by the parties in connection with the evidentiary hearing held February 2-5, 2009.

previously approved actions in violation of the UDC.  See id., Section 17.3.3 at 228.  An appeal of any decision by the Executive Director, in the enforcement of the UDC, may be made to the Zoning Board of Adjustment.  See id., Section 3.6.3(A) at 40.  Table 2.2 of the UDC provides that the Executive Director makes recommendations to the decision makers, i.e., the MPC, as to PUDs.  See id. at 9.  The MPC must then hold a public hearing and ultimately makes the final decision as to PUDs.  See id.

Under the UDC, all driveway cuts providing access to multifamily dwellings or nonresidential uses must be approved by the City Engineer.  See id., Section 12.5.15.A.1 at 192 ("All driveway cuts into the street must be approved by the City or Parish Engineer.").  In relation to arterial streets such as The Arthur Ray Teague Parkway ("the Parkway"), Section 12.5.E.1 provides:

> Direct access to an arterial street is prohibited except when the subject property has no other reasonable access to the street system and the City or Parish Engineer determines that access onto the arterial street can be safely accommodated.

Id. at 194.

Section 16.1.2 states that "if the provisions of this Ordinance are inconsistent with one another, or if they conflict with provisions found in other adopted ordinances or regulations of the county, the more restrictive provision will control."  Id. at 225.

B.     The City Council.

The Bossier City Home Rule Charter provides that the City "shall have and may exercise all the powers, rights, privileges and immunities which are now or may hereafter be or could be conferred upon municipalities by the constitution and general laws of the state."  Record Document 59 at 39, citing The Bossier City Home Rule Charter, Section

2.01. The City also has "all other powers pertinent to the government of a city the exercise of which is not expressly prohibited by the constitution of the state and which, in the opinion of the council, are necessary or desirable to promote the general welfare of the city and the safety, health, peace, good order, comfort, convenience and morals of its inhabitants." Id. All powers of the city are vested in the City Council. See id., citing The Bossier City Home Rule Charter, Section 3.07.

C. **The Arthur Ray Teague Parkway ("the Parkway").**

Under the Bossier Comprehensive Land Use and Development Master Plan, which was adopted by the City Council in 2002, the Parkway is a classified as a "Minor Arterial" street. Exhibit D-15 at 7-25, Figure 7.6. Minor Arterial streets have "limited driveway access." See id. at 7-28, Table 7.3. The Bossier Comprehensive Land Use and Development Master Plan further provides:

Access Management

The transportation system is designed to provide access to adjacent land uses and intersecting streets. However, the number of access points can directly affect the efficiency and safety of the street system.

Id. at 7-2 through 7-3. Goal 7.6 of the Bossier Comprehensive Land Use and Development Master Plan is to "manage access to land uses from the transportation system in order to reduce or minimize the risk of accidents and increase travel efficiency." Id. at 7-9.

On July 22, 2003, the MPC and the City Council approved a shared curb cut[3] on the

---

[3]The phrase "curb cut" typically refers to driveway access. See Record Document 53 at 45. However, as used in the instant proceeding, the phrase "curb cut" has a broader meaning and refers to the intersection of a major collector street with the Parkway. See id. at 45, 122; Exhibit P-62 (Diagrams). This major collector street would essentially be an extension of Centurytel Center Drive running through the Walker Place Development and then intersecting/connecting with the Parkway. See id.

Parkway for the benefit of the Veterans Retirement Home and for the future development of adjacent land.  See Exhibits D-9 & D-10.  The MPC required that any expansion of the Veterans Home, which was landlocked, come through the single drive/curb cut.  See Exhibit D-21.

      **D.      Negotiations Regarding the Development of the Land at Issue in this Case.**

In 2003, representatives from U.L. Coleman Company, Ltd. ("Coleman Company") approached the City regarding possible development sites, expressing a specific interest in developing multi-family and/or mixed-use properties in the neighborhood of the Boardwalk.  See Record Document 53 (Evidentiary Hearing Transcript) at 14.  The City informed Coleman Company representatives that such developments  would not be possible until approximately 2017.  See id. at 14-15.  Instead, the City, through its City Engineer Mark Hudson ("Hudson"), informed the representatives about some additional land owned by the City in the neighborhood of the CenturyTel Center and asked if the company would be interested in entertaining a multi-family development on that piece of property.  See id. at 15.  The 24.8 acre tract of land, which was designated for a mixture of commercial and residential uses in the 2002 Bossier Comprehensive Land Use and Development Master Plan, fronted on the east side of the Parkway.  See Exhibit P-1 at Figure 5.4.

In the summer of 2003, the City and the Coleman Company entered into negotiations regarding the purchase and development of the 24.8 acre tract of land.  See Record Document 53 at 15.  The Coleman Company representatives involved in the

negotiations included U.L. "Linc" Coleman, III ("Coleman"),[4] Heath Rheay ("Rheay"), Roger Clark ("Clark"), Stacy Odom, and Scotty Jones. <u>See id.</u> at 17-18. In order for the land to be sold through a nonpublic bid process, the City required the Coleman Company to secure a study on the "Economic Impact of a Multi-Use Development in Bossier City" from the Center for Business and Economic Research at Louisiana State University Shreveport. The City would then require the company to present the multi-use development to the mayor's team, the Parkway and Riverfront Development Oversight Committee, and finally the South Bossier Assembly. <u>See id.</u> at 16. These discussions predated a November 12, 2003 letter from Pam Glorioso ("Glorioso"), the City's Project Coordinator, to Clark of the Coleman Company, wherein the City outlined initial work it had performed in preparing for the possible sale and development of the 24.8 acre tract of land, including a land appraisal by Robert Russell; notification that the property would require MPC approval for proper zoning; and certain restrictions as to what would be located on the tract of land. <u>See</u> Exhibit P-72. The Coleman Company agreed to the use of this appraisal. <u>See</u> Record Document 53 at 20. The City and the Coleman Company agreed upon a purchase price of $1.43 million. <u>See id.</u>; Exhibit P-5.

Next, the Coleman Company prepared a set of conceptual drawings to be used during its presentations to the Parkway and Riverfront Development Oversight Committee

---

[4]In 1973, Coleman founded the predecssor to the Coleman Company. <u>See</u> Record Document 53 at 8. He currently serves as the President of the U. L. Coleman Companies. He received his undergraduate degree and a MBA from Centenary College. <u>See id.</u> at 7. He also attended the Harvard Advanced Program for advanced management/development practices, which is a three-year program for CEOs in the real estate and development business. <u>See id.</u> at 8. He is also a certified commercial investment member of the National Institute of Real Estate, certified property manager of the Institute of Real Estate Management. <u>See id.</u> at 7-8.

and the South Bossier Assembly.  See Record Document 53 at 20.  On June 11, 2004, Coleman Company representatives presented conceptual drawings of the Walker Place Multi-Use Development at a Parkway and Riverfront Development Committee meeting. See Exhibit D-13.  Government officials in attendance included Mayor George Dement; Chairman Lorenz "Lo" Walker, who was also serving as the City's Chief Administrative Officer ("CAO") at the time;[5] Glorioso; the City's Chief Financial Officer Charles Glover; the MPC's Executive Director Sam Marsiglia ("Marsiglila"); and Hudson.  See id.  Guests at the meeting included Coleman, Jim Robinson, Ann Danowsky, Rheay, and Scotty Jones.  See id.  The conceptual drawings presented at this meeting show no curb cut onto the Parkway. See id.; Exhibit D-12.  Following the meeting, Coleman received a phone call from CAO Walker.  See Exhibit P-6.  Coleman asked CAO Walker about the City's land use policy with respect to the land to the north of the 24.8 acre tract and also inquired as to curb cuts onto the parkway.  See id.  CAO Walker agreed to "discreetly" check on these issues without jeopardizing the Walker Place Development.  See id.

The Plaintiffs contend, and the Court assumes to be true for purposes of the preliminary injunction proceeding, that various city officials gave repeated assurances that if the 24.8 acre tract of land was purchased, they would be given full opportunity to develop the property for multi-uses and would have access to the Parkway.  Thus, the Plaintiffs continued to move forward with negotiations regarding the 24.8 acre tract of land and also

---

[5]During the early stages of the negotiations regarding the Walker Place Development, George Dement was the City's mayor.  See Record Document 53 at 21.  Mayor Dement's term ended in June 2005.  See id.  CAO Walker was then elected mayor and has served in that capacity for approximately three years and eight months.  See Record Document 53-6 at 694.

began negotiations relating to several tracts of land adjacent to the City owned property. See Record Document 13 at 4-5. The adjacent tracts to the north included "the Peters property," which consisted of approximately 26.5 acres and the "Hall property," which consisted of approximately .8 acres. See Record Document 53 at 12; Exhibit P-62 (Color Overlay of D-2).

On July 12, 2004, the same conceptual drawings shown to the Parkway and Riverfront Development Oversight Committee were presented to the South Bossier Assembly. See Record Document 53-3 at 281-282; Exhibit D-12. Again, these drawings showed no curb cut onto the Parkway. During the evidentiary hearing, Coleman testified regarding conceptual plans presented at the July 12th South Bossier Assembly meeting:

> So, this was a preliminary study that was represented to all parties as being a conceptual plan that was certainly modified once we had full planning, full market information, full feasibility information and the like.

Id. at 281. Councilman Scott Irwin, who was present at the July 12th meeting, testified that the method of ingress and egress to Walker Place Development described at the meeting "was one way in off of Walker Road." Record Document 53-5 at 626. When a resident in attendance at the meeting expressed concern to Coleman regarding the limited access, Coleman stated that he had plans to buy additional property and have access to Barksdale Boulevard. See id.

On August 13, 2004, the Coleman Company entered into an "Agreement to Purchase and Sell" with the City in order to buy the 24.8 acre tract of land. See Exhibit P-5. The purchase price of the property was $1.43 million. See id. Section VII of the agreement provides:

Purchaser agrees to construct the proposed project in conjunction with the

Construction Standards and Exterior Building Materials set forth on Exhibit "B" attached hereto and to generally adhere to the Master Plan as presented on Exhibit "B".

Id. at 3. Exhibit "B," which is a conceptual drawing, does not show a curb cut onto the Parkway. Likewise, the "Agreement to Purchase and Sell" does not reference a curb cut onto the Parkway. The closing was to occur on or before November 4, 2004. See id. On October 29, 2004, the parties agreed to an extension of the closing date until the 24.8 acre tract could be rezoned Riverfront Development District ("RFD"). See Exhibit P-22 (Supplement). All other terms and conditions contained in the August 13, 2004 sales agreement remained in place. See id.

On August 19, 2005, Sequoia Venture #2 Ltd., an affiliate of the Coleman Company, submitted an application to the MPC for rezoning of the 24.8 acre tract from Residential-Agricultural District ("R-A") to RFD. See Exhibit P-71; Record Document 1, ¶ 5. This application, MPC Case C-110-05, was the subject of a preliminary hearing on September 19, 2005. See Exhibit D-16. The MPC approved C-110-05 and the case moved forward to a public hearing. See id.

On October 3, 2005, Joe Peters ("Peters") and Sonia Peters Cassidy ("Cassidy") entered into a Buy/Sell Contract with Sequoia Venture #2 Ltd. for the 17.2 adjacent tract of land to the north. See Exhibit P-9. The purchase price for the transaction was $750,000. See id.

On October 17, 2005, a public hearing was held in MPC Case C-110-05 to consider the application of Sequoia Venture #2 Ltd. for rezoning of the 24.8 acre tract. See Exhibit D-17. At this time, Sequoia Venture #2 Ltd. also sought approval for its PUD. See id. The MPC approved the rezoning, but delayed approval of the PUD. See id. On November 1,

2005, the City Council approved the rezoning of the 24.8 acre tract.  <u>See</u> Record Document 59 at 7-8, ¶ 9.

On November 7, 2005, Louis Hall, Carol Hall King, Rance Hall, Bernal Hall, Peters, Cassidy, Fannie Peters Macha, Constance Modica, Vinent Marsiglia, Frances Marsiglia Smith, Bobbie Jean Peters, and Angela Marsiglia Ebarb entered into a Cash Sale Deed with Sequoia Venture #2 Ltd. for the 9.447 adjacent tract of land to the north.  <u>See</u> Exhibit P-10.  The purchase price for the transaction was $259,792.50.  <u>See id.</u>

On November 21, 2005, the MPC held another public hearing to consider the application of Sequoia Venture #2 Ltd. for a rezoning of the 26.6 acre adjacent tracts to the north from R-A, Limited Business District, and General Business District to RFD.  <u>See</u> Exhibit D-19.  This application, MPC Case C-123-05, was combined with MPC Case C-124-05, which was the PUD application for approval of the PUD on the entire 52 acre development.  <u>See id.</u>  The site plan presented was for the first phase of development, <u>i.e.</u>, the southern 24.8 acre tract, and showed no curb cut onto the Parkway.  <u>See</u> Exhibit D-18. Rheay, the representative from Sequoia Venture #2 Ltd. and the Coleman Company present at the meeting, stated:

> We do understand that if we make any changes from this [the site plan presented at the meeting], that we will come back with an Amended PUD.

Exhibit D-19.  The MPC approved both the rezoning in C-123-05 and the PUD in C-124-05. <u>See id.</u>  C-123-05 was referred to the City Council for necessary action.  <u>See</u> Exhibit P-18. The City Council approved the rezoning on December 6, 2005.  <u>See</u> Exhibit P-20.

In December 2005, the Coleman Company assigned its rights to the 24.8 acre tract to A. Teague Parkway, LLC ("ATP"), an affiliate of the Coleman Company.  See Record

Document 13 at 6; Record Document 2, ¶ 3.  On December 30, 2005, the City and ATP closed on the 24.8 acre tract, with the final purchase remaining at $1.43 million.  See Exhibit P-22.  The cash sale deed did not reference a curb cut onto the Parkway.  See id.

On May 16, 2006, Sequoia Venture Ltd. #2 submitted its fourth and final application (MPC Case C-44-06) to the MPC for approval of the PUD on the entire 52 acres.  See Exhibit P-24.  A composite map showing the acreage of the development, but no curb cut onto the Parkway, was attached to the application.  See id.  On May 25 and 30, 2006, Sequoia Venture Ltd. #2 amended the PUD application, submitting a new site plan showing a curb cut onto the Parkway.  See Exhibits D-20; P-26; P-27.  While the Defendants contend this was the first time MPC members knew of a curb cut, the Plaintiffs maintain, and the Court assumed to be true for purposes of the preliminary injunction proceeding, that many city officials knew of, and have given their oral approval to, the curb cut onto the Parkway.

On May 27, 2006, Sequoia Venture Ltd. #2 filed a petition for specific performance against Cassidy and Peters seeking to enforce the October 3, 2005 Buy/Sell Contract relating to the 17.229 adjacent tract of land to the north.  See Exhibit P-25.  Sequoia Venture Ltd. #2 was prepared to proceed to closing under the terms of the contract; however, Cassidy and Peters refused to close the transaction according to the terms of the agreement.  See id.

On June 19, 2006, the MPC held a public hearing on the amended PUD in MPC Case C-44-06.  See Exhibits P-28; D-21.  Rheay was present at the hearing to represent Sequoia Venture Ltd. #2.  See id.  Much of the discussion focused on "the public street access out onto the Parkway."  Exhibit D-21 at 2.  Rheay explained that the curb cut onto

the Parkway was not essential to the first phase of development shown in the new site plan (D-20), but that it would "be part of a future development."  Id. at 2.  The minutes of the public hearing reflect that C-44-06 was approved "with the exception of a curb-cut on the parkway until the traffic study warrants."  Exhibit P-28.  The transcript reads as follows:

> Art Schuldt - I share Brett's concern having an access onto . . . the Arthur Ray Teague Parkway especially making that assumption ahead of a traffic analysis.  I would say that probably the only item that bothers me with the whole plan. . . .
>
> Donnie McDaniel - My only comment is that for this particular project right here you just said that it's not essential for this; therefore, my concern goes back to Brett. . . .  Now as this expands and you go to that, I would not be against a curb cut right there, to those other properties when you develop that.  But at this point and time I think it's a little bit ahead of the program.
>
> Buster Constanzi - I'll have to agree with that, I think if it's necessary, you come back for the curb cut.
>
> Brett Matttison - Or submit a traffic study of what your proposed future development impact might be.  And that may prove out, that it is necessary.  But on its own merits, just looking at it, it doesn't necessitate having a curb cut in the Parkway.
>
> . . .
>
> Art Schuldt - As far as the multi family goes, I think I don't have a problem with that layout . . .
>
> . . .
>
> I think what we are saying is, that we would approve the PUD, what we would like to see before approval of the curb cut, is a traffic study.
>
> . . .
>
> We can approve the PUD today, but before we approve the curb cut out onto Arthur Ray Teague, I think we would like to see the traffic study.  So if you can bring that to the next meeting, then we could approve the curb cut at that time.

Exhibit D-21 at 4-6.  C-44-06 was approved with the condition stated.  See id. at 6.

According to the Plaintiffs, this was the first mention and/or inquiry as to a traffic study and the first objection regarding a curb cut onto the Parkway. <u>See</u> Record Document 53 at 114. The Plaintiffs submitted the Fehr & Peers Walker Place Transportation Analysis to MPC Executive Director Marsiglia on July 13, 2006. <u>See id.</u> at 115; Exhibit P-30. The Executive Summary of the Transportation Analysis provides:

> The connection of Centurytel Center Drive into Arthur Ray Teague Parkway should be constructed to mitigate traffic from Walker Place and the intersection of Walker Place/Barksdale Boulevard.

Exhibit P-30 at 4.

By letter dated July 14, 2006, MPC Executive Director Marsiglia informed Rheay of Sequoia Venture #2 Ltd. that the MPC decision to approve the Walker Place Development 52 acre PUD was invalid. <u>See</u> Exhibit P-34. Specifically, the letter stated:

> It has come to my attention that a portion of the property, on which te Walker Place Apartments are situated, is owned by individuals other than Sequoia Venture #2 Ltd. . . .
>
> In the absence of ownership we require the property owner to sign the application or require the applicant to present the MPC office with documentation of the owner's consent.
>
> The current owners of these parcels have informed me that you do not have permission to apply for a multi-family PUD on the parcels in question.
>
> As a representative of Sequoia Venture #2 Ltd., you signed the application filed with the MPC office as the property owner. As there are other property owners involved, the MPC decision to approve the above project [Walker Place Multifamily Development] is invalid. At such time that the subject properties are wholly owned by Sequoia Venture #2 Ltd. or you have the additional property owners' permission, the Bossier MPC can again review the PUD application.

<u>Id.</u> The property referred to in the letter is the 17.2 acre adjacent tract of land to the north, which was the subject of a pending petition for specific performance. While the precise

familial relation is somewhat unclear, Marsiglia admitted during the evidentiary hearing that he refers to both Cassidy and Peters as cousins.  See Record Document 53-5 at 508-509. Moreover, based on his testimony at the evidentiary hearing, it appears that Cassidy was the "current owner" who informed Marsiglia that Sequoia Venture #2 Ltd. "did not have permission to apply for a multi-family PUD on the parcels in question."  Exhibit P-34.

On July 18, 2006, the City Council introduced, and adopted on August 1, 2006, an ordinance limiting curb cuts onto the Parkway to those in existence on July 1, 2006, unless specifically approved by ordinance adopted by the Council.  See Exhibits P-36, P-38.  The Preamble of Ordinance No. 68 of 2006 states, among other things, that the Parkway was constructed to facilitate traffic flow north and south; traffic movement is a significant issue to the citizens of Bossier City; curb cuts slow traffic flow with the need for ingress and egress to driveways and this can cause vehicular accidents; and allowing additional curb cuts on the Parkway will create impediments to the flow of traffic north and south.  See Exhibit P-38.  Also on August 1, 2006, a motion to introduce an ordinance authorizing a curb cut on the Parkway for the Walker Place Development by the Coleman Company and/or Sequoia Venture #2 Ltd. failed by a unanimous vote.  See Exhibit P-36.

On October 10, 2007, the Louisiana Court of Appeal for the Second Circuit ordered specific performance of the 2005 Buy/Sell Contract between Sequoia Venture #2 Ltd. and Peters and Cassidy.  See Exhibit P-45.  On January 11, 2008, the Supreme Court of the State of Louisiana denied the application for writ of certiorari and/or review filed by Cassidy and Peters.  See Exhibit P-46.

By letter dated September 8, 2008, MPC Executive Director Marsiglia informed Kenneth Hill of the Coleman Companies of "several items [that] remain to be satisfied in

the technical review of the plans and specifications [in relation to the Walker Place Apartment Development]," namely "the deceleration lanes on Walker Place" and "the elimination of any reference to a curb cut on the Arthur Ray Teague Parkway." Exhibit P-57. Executive Director Marsiglia went on to state that once the technical requirements were addressed, the City would continue its processing of the plans. See id. The Plaintiffs have refused to comply with the aforementioned technical requirements. Instead, they filed a Complaint for Injunctive Relief and Monetary Damages on December 26, 2008. See Record Document 1.

## II. CONCLUSIONS OF LAW.

The Plaintiffs allege that the Defendants have violated their substantive due process rights in denying the permit for the Walker Place Development. Specifically, the Plaintiffs argue that they had a vested property right in the curb cut onto the Parkway and a legitimate and justifiable expectation in receiving curb cut access onto the Parkway. They contend that the actions of the Defendants in attempting to impair that vested property right and justifiable expectation were arbitrary and capricious. At this stage of the litigation, the Plaintiffs seek preliminary injunctive relief, specifically an order prohibiting the Defendants from denying the permit with the required conditions of a waiver of curb cut access onto the Parkway and for deceleration lanes on Walker Place.

### A. Preliminary Injunction Standard.

The grant or denial of a preliminary injunction lies in the discretion of the district court. See Canal Auth. of State of Fla. v. Callaway, 489 F.2d 567, 572 (5th Cir. 1974). However, such discretion is not unbridled and must be exercised "in light of what [the Fifth Circuit has] termed the four prerequisites for the extraordinary relief of preliminary

injunction." Id. (internal citation and quotation omitted). Under this standard, plaintiffs seeking preliminary injunctive relief must demonstrate: "(1) a substantial likelihood that [they] will prevail on the merits, (2) a substantial threat that [they] will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to [them] outweighs the threatened harm the injunction may do to defendant[s], and (4) that granting the preliminary injunction will not disserve the public interest." Id. "A preliminary injunction is an extraordinary remedy which courts grant only if the movant has clearly carried the burden as to all four elements." Guy Carpenter & Co., Inc. v. Provenzale, 334 F.3d 459, 464 (5th Cir. 2003).

When considering these prerequisites, the district court must remember that a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly carries the burden of persuasion. See Canal Auth. of State of Fla., 489 F.2d at 573; House the Homeless, Inc. v. Widnall, 94 F.3d 176, 180 (5th Cir. 1996) ("We have frequently cautioned that '[a] preliminary injunction is an extraordinary remedy,' and '[t]he decision to grant a preliminary injunction is to be treated as the exception rather than the rule.'"). The chief aim for applying this extraordinary remedy is to preserve the court's ability to render a meaningful decision on the merits. See id. The Fifth Circuit has further reasoned:

> Although the fundamental fairness of preventing irremediable harm to a party is an important factor on a preliminary injunction application, the most compelling reason in favor of (granting a preliminary injunction) is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act. Thus only those injuries that cannot be redressed by the application of a judicial remedy after a hearing on the merits can properly justify a preliminary injunction.

Canal Auth. of State of Fla., 489 F.2d at 573 (internal citation omitted).

Many times, courts loosely state that the purpose of a preliminary injunction is to preserve the status quo.  See id. at 576.  However, there is no "particular magic" in the phrase.  Id.  Instead, the focus should be "to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits."  Id.  While "it often happens that this purpose is furthered by preservation of the status quo," such is not always the case.  Id.  Thus, the focus of the court's inquiry must be prevention of injury by a proper order, not merely preservation of the status quo.  See id.

**B.      Irreparable Injury.**

Under Canal Auth. of State of Fla., the Plaintiffs in the instant matter must establish "a substantial threat that [they] will suffer irreparable injury if the injunction is not granted."  Canal Auth. of State of Fla., 489 F.2d at 572.  "An injury is 'irreparable' only if it cannot be undone through monetary remedies."  Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. 1981).  The Supreme Court has explained irreparable injury as follows:

> The key word in this consideration is irreparable.  Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction] are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

Sampson v. Murray, 415 U.S. 61, 90, 94 S.Ct. 937, 953 (1974); see also Torries v. Hebert, 111 F.Supp.2d 806, 813 -814 (W.D.La. 2000) ("An irreparable injury is an injury which cannot be redressed by a legal or equitable remedy following trial.  The preliminary injunction must be the only way of protecting the plaintiff from such harm.  If adequate compensatory damages will ultimately be available in the ordinary course of litigation, the

existence of an irreparable injury is severely compromised.")

In their post-hearing briefs, the Plaintiffs identified "eight separate actions of irreparable injury":

1. The ongoing well orchestrated scheme by the Defendants has resulted in intentional acts by them to obstruct the permit process for the Walker Place Development which cannot be stopped without Court intervention.

2. The action of the Plaintiffs have all been rendered futile by the Defendants' actions.

3. The actions of the Defendants have resulted in a loss of economic impact to the citizens of South Bossier in excess of $261,000,000.

4. Ongoing negative publicity jeopardizes the Walker Place Development.

5. Loss of HUD financing.

6. The inability of the Defendants to pay the Plaintiffs' damages.

7. Mental anguish and unnecessary torment to the Plaintiffs.

8. The totality of the circumstances warrant a finding of irreparable harm.

Record Document 55 at 12-24; Record Document 60 at 4.

The Plaintiffs maintain that city officials[6] from all across Bossier City government have engaged in a well orchestrated scheme resulting in a long series of intentional acts designed to obstruct the Walker Place Development permit process based on bogus arguments with no legitimate government interest. See id. at 12. According to the Plaintiffs, the "grossly abusive" collective conduct on the part of the Defendants has

---

[6]The city officials include, but are not limited to, the City Council, the MPC members, the MPC Executive Director, the City Engineer, the City Attorney, and their outside trial counsel. See Record Document 55 at 12.

resulted in a "roadblock" in the permit process which can only be remedied by court intervention in the form of a preliminary injunction.  Id. at 12, 18.  Specifically, they argue:

> The Defendants are withholding the Plaintiffs' permit on specious grounds.
> . . .  All of the Plaintiffs' efforts in attempting to overcome this unnecessary
> and unsupported condition [i.e., elimination of any reference to a curb cut on
> the Teague Parkway for the 16.67-acre development tract at issue] have
> been futile.  The Plaintiffs have no form of relief without this Court's action as
> they are in a futile stalemate.

Id. at 19.  Finally, the Plaintiffs note that they have incurred a minimum direct cost in excess of $4,000,000 for the development of Walker Place, further evidencing that "the irreparable harm [in this case] is well defined and straightforward as the Defendants will continue their intentional acts unless the Court intervenes to prevent them from this destructive course of action to the Walker Place Development."  Id. at 13, 18.

The Court finds that the alleged "grossly abusive" collective conduct on the part of the Defendants in this case may be remedied by a monetary award.  Their alleged injuries, however substantial, are comprised of money, time and energy expended in relation to the Walker Place Development.  There will be adequate compensatory relief for all of these injuries in the ordinary course of litigation.  The Plaintiffs' contention that they have no form of relief without a preliminary injunction is also without merit.  While the Plaintiffs' lawsuit proceeds, they have the choice of (1) agreeing to the terms set forth in MPC's letter of September 2, 2008 and continuing with the Walker Place Development project, particularly the first 16.67-acre PUD project;[7] or (2) abandoning the Walker Place Development

---

[7]At MPC's public hearing on June 19, 2006, Rheay explained that the curb cut onto the Parkway was not essential to the first phase of development shown in the new site plan (D-20), but that it would "be part of a future development."  Exhibit D-21 at 2.

altogether and seeking a buyer for the land at issue in this case.[8]  Under either approach, if it is ultimately determined that the Defendants violated the Plaintiffs' constitutional rights and/or Louisiana law, any actionable harm  suffered by the Plaintiffs can be remedied by an award of money damages.  See generally Acierno v. New Castle County, 40 F.3d 645, 653-655 (3rd Cir. 1994).

Next, the Plaintiffs argue that the abusive actions of the Defendants have resulted in a loss of economic impact to the citizens of South Bossier in excess of $261,000,000.  See Record Document 55 at 20.  In support of this contention, the Plaintiffs refer to Coleman's testimony during the evidentiary hearing, which was based in large part on the "Economic Impact of a Multi-Use Development in Bossier City" prepared for U.L. Coleman Companies by the Center for Business and Economic Research at Louisiana State University Shreveport in June 2004.  See id. at 20; Evidentiary Hearing Exhibit P-3.  The study suggests that the economic impact of the entire development will exceed $500,000,000.  See id.  Despite these impressive figures, the Court questions the legal relevance of the "loss of economic impact to the citizens of South Bossier" in relation to the irreparable harm analysis.  Under Canal Auth. of State of Fla., the analysis focuses on

---

[8]Ordinance No. 68 of 2006 provides in pertinent part:

> NOW, THEREFORE, BE IT ORDAINED by the City Council of Bossier City, Louisiana, in regular session convened, that Curb Cuts on the A.R.T. Parkway are restricted to only those in existence on July 1, 2006; **unless approved by the Bossier City Council pursuant to an Ordinance adopted by the Bossier City Council**.

Exhibit P-38 (emphasis added).  Thus, the Court observes that there is nothing preventing the Plaintiffs from introducing another ordinance to the City Council seeking authorization for a curb cut onto the Parkway for the Walker Place Development, particularly if there is a change in the membership composition of the City Council.

whether the Plaintiffs, not the residents of South Bossier, will suffer a substantial threat of irreparable injury if the injunction is not granted. See Canal Auth. of State of Fla., 489 F.2d at 572. Notwithstanding, any actionable claim[9] for loss of economic impact to the citizens of South Bossier can be remedied by a monetary award.

The Plaintiffs also maintain that ongoing negative publicity, which is jeopardizing the Walker Place Development, supports a finding of irreparable injury. See Record Document 55 at 21. They point to public hearings held in the summer of 2004, during which the South Bossier Assembly and the Riverfront Development Oversight Committee both expressed support for the Walker Place Development project. See id. The Plaintiffs contend that the actions of city officials, specifically their attempts to derail the Walker Place Development, have resulted in negative publicity which has directly affected the interest of potential residents of the multi-family community, small business owners in locating businesses in the development, and participation by joint venture partners. See id. [10]

---

[9]The Plaintiffs in this action are business entities, not individual residents/citizens of South Bossier; thus, any attempt by the Plaintiffs to recover on the behalf of the residents/citizens of South Bossier is improper.

[10]The Plaintiffs did not allege in their Motion for Preliminary Injunction, nor did they argue in their post-hearing briefs, that injury to the Plaintiffs' reputation as real estate developers was a grounds for finding irreparable injury. See Allied Mktg. Group, Inc. v. CDL Mktg., Inc., 878 F.2d 806, 810 (5th Cir. 1989); Valley v. Rapides Parish Sch. Bd., 118 F.3d 1047, 1055-56 (5th Cir. 1997). Notwithstanding, this record does not show that the Plaintiffs' reputation as real estate developers has been significantly damaged by the actions of the Defendants. At the evidentiary hearing, Coleman testified that the roadblocks in the permit process had been demoralizing and discouraging for his team and had damaged his company and its reputation. See Record Document 53 at 135-136; Record Document 53-2 at 227, 235, 247. Coleman also stated that if the Plaintiffs turn down HUD financing for a second time, he believes that his company's reputation will be damaged with HUD. See Record Document 53-2 at 236. Yet, there was also testimony regarding Coleman's reputation as a real estate developer, namely that he was known for building quality developments and maintaining good projects. See Record Document 53-6 at 697.

There was testimony at the evidentiary hearing demonstrating that the Walker Place Development changed in size and scope from the summer of 2004 to the summer of 2006. <u>See</u> Record Document 53-5 at 617-619; Record Document 53-6 at 649. Moreover, the Court heard no testimony as to the effect of ongoing negative publicity from potential residents, small business owners, and/or joint venture partners. Thus, it appears that this injury is too remote and speculative to justify a preliminary injunction. <u>See</u> <u>Acierno</u>, 40 F.3d at 655. Notwithstanding, the aforementioned allegations are essentially claims for diminution in property value, loss of business opportunity, and/or lost profit; thus, any harm suffered due to the loss of potential residents, small businesses, and joint venture partners can be measured in monetary terms and satisfied by a damage award after trial on the merits. <u>See id.</u> ("Even if we view Acierno's anchor tenant's problem in the direction he asks, his problem is not solved on this record's showing of irreparable harm. An inability to precisely measure financial harm does not make that harm irreparable or immeasurable.").

Additionally, the Plaintiffs argue that they will suffer irreparable injury due to the loss of their HUD financing. <u>See</u> Record Document 55 at 21. The Plaintiffs, who face a March 7, 2009 HUD financing deadline to obtain a building permit for the multi-family phase of the Walker Place Development, maintain that HUD is the only source of financing for this project at this time. <u>See id.</u> They contend that HUD officials understand that the curb cut

---

The Plaintiffs have failed to argue this point and the evidence presented at the evidentiary hearing as to this issue was scant at best. Thus, the Court finds that the record reveals only a slight potential for harm to the Plaintiffs' reputation, which is insufficient to support a finding that a substantial threat of irreparable injury exists if the preliminary injunction is not granted.

is part of the Walker Place Development and that, without the curb cut, the Walker Place Development will not be successful.  See id.; Exhibit P-74A and 74B.  According to the Plaintiffs, they cannot, in good faith, go forward with the financing for the project without the Parkway access.  See id.

Again, the Court finds that the loss of HUD financing is compensable with an award of money damages, specifically any financial loss due to HUD or another lender including "less favorable interest rates and other terms" in a new financing agreement.  See Record Document 1, ¶ 39.  Further, even considering the current state of the economy and the struggles facing those in search of resources for real estate development loans, the Court is not convinced that the Plaintiffs have established that HUD is the only source of financing for this project at this time.  At the evidentiary hearing, Coleman testified that from his perspective and understanding, the Plaintiffs would be denied HUD financing without access to the Parkway.  See Record Document 53-3 at 250.  Yet, during a January 29, 2009 deposition, when asked if he knew for a fact from HUD that if the Plaintiffs did not have the curb cut they would be denied funding, Coleman answered: "I cannot speak for HUD."  Id. at 252-253.  Coleman further admitted during the evidentiary hearing that the Plaintiffs had not requested a waiver of the curb cut and/or requested a substitution of access from the Parkway curb cut to Barksdale Boulevard in order to secure HUD financing.  See id. at 254-255.  Cognizant that a preliminary injunction is an extraordinary remedy which should be granted only if the Plaintiffs have clearly carried their burden, the Court notes that it heard no testimony, and the record contains no affidavit or sworn statement, from a HUD official confirming that the Plaintiffs' financing will be denied without access to the Parkway.  See Guy Carpenter & Co., Inc., 334 F.3d at 464 ("A preliminary

injunction is an extraordinary remedy which courts grant only if the movant has clearly carried the burden as to all four elements."). The record is also devoid of testimony from an expert in the field of commercial real estate lending establishing that HUD is the only source of financing for this project at this time. Thus, the Court is not convinced that the Plaintiffs have met their burden of establishing a likelihood that irreparable harm will occur, as compared to the possibility of some remote future injury. See U.S. v. Emerson, 270 F.3d 203, 262 (5th Cir. 2001) ("There must be a likelihood that irreparable harm will occur. Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant. Thus, a preliminary injunction will not be issued simply to prevent the possibility of some remote future injury. A presently existing actual threat must be shown. However, the injury need not have been inflicted when application is made or be certain to occur; a strong threat of irreparable injury before trial is an adequate basis.").

Next, the Plaintiffs argue that the inability of the Defendants to pay damages constitute irreparable injury. See Record Document 55 at 21. The Plaintiffs are seeking the recovery of their direct costs, which are approaching $5,000,000. See id. They will also be seeking claims for loss of past and future profits, which will likely exceed $50,000,000. See id. The Plaintiffs argue that is unlikely that the Defendants will be able to pay such a judgment, thus resulting in irreparable injury. See id. In support of their argument, the Plaintiffs rely on Wal-Mart Stores, Inc. v. County of Clark, 125 F.Supp.2d 420 (D.Nev. 1999):

> Because Wal-Mart should prevail on the merits, the burden to show irreparable harm is substantially reduced. Even so, this Court finds that Wal-Mart would be irreparably harmed if a preliminary injunction was not granted. First, it is unlikely that monetary damages would be an adequate remedy since Wal-Mart would be unlikely to recover potential damages of one billion

dollars from Clark County.  Second, money damages would not be an adequate remedy for lost property rights "[b]ecause real property and its attributes are considered unique and loss of real property rights generally results in irreparable harm . . . ."  Dixon v. Thatcher, 103 Nev. 414, 742 P.2d 1029, 1030 (1987).  Lastly, the Court finds that when the potential harm to Plaintiffs is compared to that of Clark County, the balance of hardships tips decidedly in favor of Plaintiffs.  By issuing a preliminary injunction, the County does not incur any monetary loss or harm.  If a preliminary injunction is not issued however, Wal-Mart will continue to experience construction delays increasing the costs to complete both projects.

Wal-Mart Stores, Inc., 125 F.Supp.2d at 429.[11]

Wal-Mart Stores, Inc. is persuasive, not controlling, legal authority.  Further, the case has no direct appellate history and has been cited by another court in only one instance. [12]

Moreover, the preliminary injunction standard cited in Wal-Mart Stores, Inc. differs from the applicable standard in the Fifth Circuit.  In Wal-Mart Stores, Inc., the court stated:

To obtain a prohibitory preliminary injunction, restraining a party from further action, Wal-Mart must make a clear showing of either: (1) probable success on the merits and irreparable injury; *or* (2) sufficiently serious questions going to the merits to make the case a fair ground for litigation and a balance of hardships tipping decidedly in favor of Plaintiffs. . . .  [A] moving party need not demonstrate that he risks irreparable injury, but he must at least show that he will suffer a degree of hardship that outweighs the hardship facing the opposing party if the injunction is not issued. Similarly, a moving party need not demonstrate that he will succeed on the merits, but must at least show that his cause presents serious questions of law worthy of litigation.

Wal-Mart Stores, Inc., 125 F.Supp.2d at 424 (emphasis added).  Conversely, in the Fifth

---

[11]In Wal-Mart Stores, Inc, the court cited to a Nevada state court case and reasoned that money damages would not be an adequate remedy for lost property rights because real property and its attributes are considered unique and loss of real property rights generally results in irreparable harm."  This Court previously dealt with a similar issue when it ruled, after oral argument, that the Plaintiffs' contention that the violation of constitutional rights amounts to irreparable injury per se is inapplicable to the instant matter.  See Record Document 41.

[12]In Evans v. Burruss, 933 A.2d 872, 882 (Md. 2007), the Maryland court cited Wal-Mart Stores, Inc. v. County of Clark, 125 F.Supp.2d 420, 427 (D.Nev.1999), for the principle that "the issuance of a building permit is a purely ministerial act."

Circuit, a plaintiff seeking a preliminary injunction bears the burden of persuasion as to four prerequisites for the extraordinary relief of preliminary injunction: "(1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to him outweighs the threatened harm the injunction may do to defendant, **_and_** (4) that granting the preliminary injunction will not disserve the public interest." Canal Auth. of State of Fla., 489 F.2d at 572 (emphasis added). The plaintiff must carry the burden as to all four elements. See Guy Carpenter & Co., Inc., 334 F.3d at 464.

It appears that both the court in Wal-Mart Stores, Inc. and the Plaintiffs in this matter are attempting to apply a rationale set forth in Wright, Miller & Kane's Federal Practice and Procedure:

> Even if a loss is fully compensable by an award of money damages, however, extraordinary circumstance, such as a risk that the defendant will become insolvent before a judgment can be collected, may give rise to the irreparable harm necessary for a preliminary injunction.

9 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2948.1 at 151-152 (footnotes omitted). In this case, the issue appears to be enforcement of the judgment, not a matter of solvency. Article 12, Section 10 of the Louisiana Constitution provides in pertinent part:

> (A)   Neither the state, a state agency, nor a political subdivision shall be immune from suit and liability in contract or for injury to person or property.
>
> . . .
>
> (C)   The legislature shall provide a procedure for suits against the state, a state agency, or a political subdivision. It shall provide for the effect of a judgment, but no public property or public funds shall be subject to seizure. No judgment against the state, a state agency, or a

political subdivision shall be exigible, payable, or paid except from funds appropriated therefor by the legislature or by the political subdivision against which judgment is rendered.

In Baudoin v. Acadia Parish Police Jury, 96-1288 (La.App. 3 Cir. 9/17/97), 702 So.2d 715, 718, the court stated:

Every Louisiana court that has addressed the subject has so held. A claimant's ability to enforce a judgment against the [state, a state agency, or a political subdivision] is a matter within the legislature's control. There is no conflict within § 10, and a judgment creditor of [state, a state agency, or a political subdivision] has no way to collect his judgment except by an appropriation. Appropriation of funds is discretionary and not ministerial, and mandamus will not lie to compel payment of a judgment by a police jury [or city council].

Baudoin, 702 So.2d at 718. This case does not present the extraordinary circumstance of a risk that the Defendants will become insolvent before a judgment can be collected. Rather, this case presents an instance where the Plaintiffs may be unable to enforce a judgment against solvent Defendants, a circumstance not contemplated in Wal-Mart Stores, Inc. or Wright, Miller & Kane's Federal Practice and Procedure. See Newman Marchive Partnership, Inc. v. City of Shreveport, 2007-1890 (La. 4/8/08), 979 So.2d 1262, 1267.

The Plaintiffs maintain that the mental anguish and unnecessary torment they have suffered at the hands of the Defendants also constitutes irreparable injury. See Record Document 55 at 23. The Plaintiffs contend that their ten employees, including two project managers, have made continuous efforts for over three years to bring the Walker Place Development to fruition. See id. Yet, these employees now "face the current threat that all of their efforts have been for nothing" due to the abusive actions of the Defendants. Id. As noted by the Defendants, it is doubtful whether the Plaintiffs in this case, U.L. Coleman

Company, Ltd, Sequoia Venture No. 2, Ltd, and A. Teague Parkway, LLC, can recover damages for mental anguish, as business entities are "incapable of experiencing loss of enjoyment, mental anguish, and inconvenience." Frank C. Minvielle, L.L.C. v. IMC Global Operations, Inc., 380 F.Supp.2d 755, 772 (W.D.La. 2004), citing Whitehead v. American Coachworks, Inc., 837 So.2d 678, 682 (2002). Notwithstanding, claims for mental anguish are customarily compensated with money damages.

Finally, relying on Mt. Sinai Med. Ctr. of Greater Miami, Inc. v. City of Miami Beach, 706 F.Supp. 1525 (S.D. Fla. 1989), the Plaintiffs argue that the totality of the circumstances in this case warrant a finding of irreparable harm. See Record Document 55 at 23. The Plaintiffs argue:

> In the matter before the Court, the totality of the circumstances taken as a whole, presents a compelling picture in favor of a finding of irreparable harm and the granting of a preliminary injunction.
> . . .
> The totality of the circumstances to which the Plaintiffs have been exposed warrant a finding of irreparable harm.

Id. at 23-24. The Court disagrees, as the Mt. Sinai case is distinguishable from the instant matter.

In Mt. Sinai, the plaintiff moved for a temporary injunction prohibiting the defendant from enforcing a zoning ordinance. See id., 706 F.Supp at 1526. Specifically, the plaintiff alleged that the defendants deprived it of its property rights without due process of law and violated its equal protection rights. See id. The plaintiff also asserted that the defendant was estopped from enforcing the ordinance. See id. In determining whether there was a substantial threat that the plaintiff would suffer irreparable injury if the injunction was not granted, the court reasoned:

Lest there be much further discussion, we answer the question in the affirmative and point to eight findings:

1. The people of Dade County and, in particular, Miami Beach, will suffer a substantial cut-back in indigent health care;

2. Mt. Sinai will suffer the loss of six million dollars;

3. Mt. Sinai cannot lease space in the tower;

4. Mt. Sinai cannot obtain permanent construction funding;

5. Mt. Sinai will not be able to honor its previously executed construction contracts;

6. Mt. Sinai cannot attract quality physicians;

7. Mt. Sinai faces the loss of staff physicians to other hospitals; and

8. Mt. Sinai cannot complete its long term plan of converting the hospital into a much needed teaching institution.

Id. at 1532. The court went on to note that "[e]ach of these potential sources of injury are a sufficient basis to find the irreparable injury requirement satisfied, but, taken as a whole, they present a compelling picture which this Court cannot ignore. In comparison to the scenario of doom which Mt. Sinai paints, the City offers little retort and no contradictory evidence. In short, it is clear that this prong has been satisfied by Mt. Sinai." Id. at 1533.

Here, the Defendants argue that each of the potential sources of injury presented by the Plaintiffs do not provide a sufficient basis to find the irreparable injury requirement satisfied and that the separate actions should not be cumulated to constitute showing of irreparable injury. See Record Document 59 at 61. There are important factual differences between the Mt. Sinai case and the instant matter, namely that the plaintiff applied for a building permit in early August 1988, the plaintiff was issued a building permit on August 16, 1988, the City Attorney issued the opinion interpreting the zoning ordinance at issue

on November 8, 1988, and construction of the staff tower had already commenced at the time of the court proceeding.  See id. at 1526-1527.  The November 1988 opinion by the City Attorney was the action that thwarted the plaintiff's ability to arrange permanent financing.  See id. at 1527-1528.  In the instant matter, no building permit has ever issued and no construction is underway.  Further, the Defendants in this matter have offered extensive "retort" and "contradictory evidence" to the Plaintiffs' "eight separate actions of irreparable injury."  Accordingly, the Court finds the Plaintiffs' argument based on the Mt. Sinai case to be unpersuasive.

Based on the foregoing analysis, the Plaintiffs have not met their burden of persuasion in establishing that there is a substantial threat that they will suffer irreparable injury if the preliminary injunction is not granted.  See Canal Auth. of State of Fla., 489 F.2d at 572.  The "eight separate actions of irreparable injury," however substantial, alleged by the Plaintiffs can be "undone through monetary remedies." Record Document 55 at 12-24; Record Document 60 at 4; Deerfield Med. Ctr, 661 F.2d at 338 (5th Cir. 1981).  There is "adequate compensatory . . . relief available [to the Plaintiffs] at a later date, in the ordinary course of litigation," a circumstance that weighs heavily against a claim of irreparable harm. Sampson, 415 U.S. at 90, 94 S.Ct. at 953.  The Motion for Preliminary Injunction must be denied.[13]

## III.    CONCLUSION.

The plaintiffs have failed to establish a substantial threat that they will suffer

---

[13] The Court need not address the remaining three prerequisites for preliminary injunctive relief as the plaintiffs have not met their burden of establishing a substantial threat that they will suffer irreparable injury if the injunction is not granted.

irreparable injury if the injunction is not granted.  Specifically, the Court finds that the eight separate actions of irreparable injury alleged by the Plaintiffs are compensable through monetary remedies.

Accordingly,

**IT IS ORDERED** that the Motion for Preliminary Injunction (Record Document 2) filed by the Plaintiffs be and is hereby **DENIED**.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 26th day of February, 2009.

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE