**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

U.L. COLEMAN COMPANY, LTD,                    CIVIL ACTION NO. 08-2011
ET AL.

VERSUS                                         JUDGE S. MAURICE HICKS, JR.

BOSSIER CITY-PARISH METROPOLITAN               MAGISTRATE JUDGE HORNSBY
PLANNING COMMISSION, ET AL.

**MEMORANDUM RULING**

Before the Court is Plaintiffs' Motion to Enforce Consent Decree and Cooperative

Endeavor Agreement (Record Document 475).[1]  The Coleman Plaintiffs argue that certain

actions by officials of the City of Bossier City ("the City") demonstrate violations of the

Consent Decree and the Cooperative Endeavor Agreement ("CEA") involving the proposed

Implementation Plan for the Redevelopment Districts.  More specifically, the Coleman

Plaintiffs allege that the City is not in good faith in the creation and implementation plan for

the two Redevelopment Districts required under the terms of the Consent Decree and

CEA.  Defendant, the City, opposed the motion and maintains that it is meeting its

obligations under the Consent Decree and the CEA.  See Record Document 483.  Further,

the City contends that it has considered the comments of the Coleman Plaintiffs in relation

to the creation and implementation of the Redevelopment Districts and has responded to

such comments in good faith.  In addition to extensive briefing, the Coleman Plaintiffs'

motion came on for a two day hearing before the undersigned in November 2015.  See

Record Documents 513-514, 517-518.  For the reasons set forth below, the Coleman

Plaintiffs' Motion to Enforce Consent Decree and Cooperative Endeavor Agreement

---

[1]Plaintiffs in this matter are U.L. Coleman Company, Ltd., Sequoia Venture No. 2, Ltd., and A. Teague Parkway, LLC.  The Court will refer to them collectively as "the Coleman Plaintiffs."

(Record Document 475), including their request for attorneys' fees and the costs incurred for the utilization of land use planning experts, is hereby **DENIED**.[2]

## I.    BACKGROUND.

On December 13, 2012, this Court signed a Consent Decree to resolve the disputes in the instant lawsuit, which was originally filed in 2008.  See Record Document 423.  The Consent Decree provides, among other things, that "[t]he parties are . . . ordered to enter into a Cooperative Endeavor Agreement necessary to implement the intent of this court's ruling."  Id. at C.4.F.  The Consent Decree also references the Redevelopment District(s) to be established:

> F.    <u>SPECIFIC BENEFITS TO THE CITIZENS OF BOSSIER CITY</u>:
>
> 1.    All parties agree to specific benefits to the citizens of the City as follows:
>
> . . .
>
> g.    U.L. Coleman Companies will provide $50,000 to the City for the City to engage a national design firm to provide plans and covenants for the Barksdale Boulevard Redevelopment District (to be established).
>
> h.    U.L. Coleman Companies will provide $50,000 to the City for the City to engage a national design firm to provide plans and covenants for the redevelopment district of residential neighborhoods south of Barksdale Air Force Base. . . .

Record Document 423 at 13.  This Court retained jurisdiction for the purpose of enforcing

_____

[2]The Coleman Plaintiffs have requested reimbursement of their attorneys' fees related to the instant motion pursuant to Section D(3) of the Consent Decree and "all costs incurred regarding the use of land planning experts since the beginning of the Redevelopment District planning."  Record Document 475 at 5.  The CEA states that in the event of a breach, the non-breaching party shall be entitled to all remedies set forth in the Consent Decree.  See Record Document 424 at Article IV, Section 4.01.  As set forth infra, this Court finds no violation of the Consent Decree and no breach of the CEA; thus, an award of attorneys' fees and costs to the Coleman Plaintiffs is not appropriate.

the Consent Decree.  See id. at 11.  The Consent Decree provides, in pertinent part, that

"all decisions by Judge Hicks . . . are final and binding and are not appealable."  Id. at 12.

On December 13, 2012, the parties entered into the CEA for Walker Place

Community Benefits.  See Record Document 424.[3]  The key provisions of the CEA are set

forth below:

**ARTICLE I**
**DEFINED TERMS, RULES OF CONSTRUCTION**
**AND INTERPRETATION**

**1.02.   Defined Terms**.  As used herein, as well as in any document,
certificate, report or agreement furnished from time to time in connection with
this Agreement, the following terms shall have the meanings assigned below
unless the context otherwise requires.

. . .

**"Barksdale Boulevard Redevelopment District"** means a
Redevelopment District for the area along Barksdale Boulevard to be
established by the City in accordance with the terms described herein.

. . .

**"Coleman Boulevard Redevelopment Contribution"** means the
financial contribution to the City of $50,000.00 to be used to engage a
national design firm to provide plans and covenants for Barksdale Boulevard
Redevelopment District.

**"Coleman Neighborhood Redevelopment Contribution"** means
the financial contribution to the City of $50,000.00 to be used to engage a
national design firm to provide plans and covenants for a Redevelopment
District of residential neighborhoods south of Barksdale Air Force Base.

. . .

**"Project Plans"** means the plans, specifications, and drawings for the
Public Park which shall be prepared by the design and engineering
professionals of the City, paid for in part by the Coleman Park Contribution,

---

[3]On December 13, 2012, the parties also entered into a CEA for Walker Place
Infrastructure Projects.  See Record Document 425.  The CEA relating to infrastructure
projects is not relevant to the instant matter before this Court.

and the design plans, specifications, and drawings for the pedestrian and bicycle pathway in accordance with the City Pathway Contribution.

. . .

**"Redevelopment District"** means a geographical demarcated area within which certain best planning guidelines and practices are implemented, home ownership is encouraged, and certain public incentives, such as tax benefits and funding opportunities, are made available.

. . .

**1.03.  Rules of Interpretation.**

. . .

(d)  **No Authorship Presumption.**  Each of the Parties has had an opportunity to negotiate the language of this Agreement in consultation with legal counsel.  No presumption shall arise or adverse inference be drawn by virtue of authorship, and each Party hereby waives the benefit of any rule of law that might otherwise be applicable in connection with the interpretation of this Agreement, including but not limited to any rule of law to the effect that any provision of this Agreement shall be interpreted or construed against the Party (or whose counsel) that drafted such provision.

. . .

**ARTICLE III**
**COMMUNITY BENEFIT PROJECTS,**
**COLEMAN AND CITY OBLIGATIONS**

. . .

**3.02.  Obligations of Coleman.**  Coleman hereby agrees as follows with respect to the Community Benefit Projects:

. . .

(b)  **Barksdale Boulevard Redevelopment District Design.** Coleman will directly contribute the Coleman Boulevard Redevelopment Contribution to the City to be used to engage a national design firm to provide plans and covenants for the Barksdale Boulevard Redevelopment District, within five days of the City's engagement of said national design firm.

(c)    **Barksdale South Neighborhood Redevelopment District Design.**  Coleman will directly contribute the Coleman Neighborhood Redevelopment Contribution to the City to be used to engage a national design firm to provide plans and covenants for a Redevelopment District of residential neighborhoods south of Barksdale Air Force Base, within five days of the City's engagement of said national design firm.

**3.03.**  **Obligations of the City.**  The City hereby agrees as follows with respect to the Community Benefit Projects.

. . .

(c)    **Creation of Barksdale Boulevard Redevelopment District.** The City agrees to create and enact, in consultation and guided by the plans and covenants provided for in connection with the Coleman Boulevard Redevelopment Contribution, a Redevelopment District for the area along Barksdale Boulevard.

(d)    **Creation of Barksdale South Neighborhood Redevelopment District.**  The City agrees to create and enact, in consultation and guided by the plans and covenants provided for in connection with the Coleman Neighborhood Redevelopment Contribution, a Redevelopment District of residential neighborhoods south of the Barksdale Air Force Base.

**3.04.**  **Consultation.**  The Parties agree to consult one another, in good faith and in full cooperation, in the execution of the obligations of the Parties, as described in this Article III.  Further, the City agrees to allow Coleman the opportunity to review and provide comments to the Project Plans prior to their finalization, which comments the City shall take into full, good faith consideration.

. . .

**5.04.**  **Term of this Agreement.**  This Agreement shall continue in full force and effect until (I) the completion of the Public Park; (ii) the completion of the pedestrian/bicycle pathway over Arthur teague Parkway from the Public Park in accordance with the City Pathway Contribution; (iii) the establishment by the City of the Barksdale Boulevard Redevelopment District in connection with the Coleman Boulevard Redevelopment Contribution; and (iv) the establishment by the City of a Redevelopment District of residential neighborhoods south of Barksdale Air Force Base in connection with the Coleman Neighborhood Redevelopment Contribution.

Id.

Beginning in the summer of 2014, this Court began attending and monitoring construction progress meetings.  See Record Document 438.  The vast majority of these construction progress meetings focused on the construction of the park and the pedestrian bridge; however, the Court monitored the City's work as to the redevelopment districts required under the Consent Decree and CEA.  See Record Document 471-5 (Final Minutes of 05.29.15 Progress Meeting).[4]  In fact, during the November 2015 hearing, this Court remarked that it had "pretermitted redevelopment districts and shoved it to the back burner" while the park and bridge projects were on front-burner status."  Record Document 517 at 14.  The Court's minutes from the June 29, 2015 status conference/construction progress meeting state:

> The Coleman Group requested additional time to submit FINAL written comments regarding the Implementation Plan for the redevelopment districts. Mr. Coleman shall contact the Court as soon as possible to advise of how much time, not to exceed 28 days, is needed for his group's FINAL comments. The communication protocols for the park and bridge project previously set remain in place.  The Coleman Group is free to contact SWA for the purpose of retaining SWA for consultation in connection with the redevelopment districts.

---

[4]The Court officially adopted the Project Manager's Minutes for the construction progress meetings held on August 14, 2014; September 11, 2014; October 9, 2014; November 6, 2014; December 11, 2014; February 26, 2015; March 31, 2015; May 29, 2015; and June 29, 2015.  See Record Documents 471 & 474.  While the Court discussed the August 6, 2015 minutes during conferences on August 28, 2015 and September 3, 2015, the Court is unable to determine if a final version of the August 6, 2015 was submitted to the Court.  See id.  By letter dated September 2, 2015, counsel for the City advised the Court:  "Mr. McSwain reports that he has received no comments to the 8/6/15 draft Progress meeting minutes circulated on 8/7/15."  Counsel's letter was also hand delivered to counsel for the Coleman Plaintiffs.  The September 2, 2015 letter appears to be the last communication/submission relating to the August 6, 2015 minutes.  Therefore, the City is hereby **ORDERED** to submit the final version of the minutes from the August 6, 2015 construction progress meeting such that the Court can adopt the minutes and make them part of the record.

Record Document 456.  On July 21, 2015, this Court granted a motion for extension of time and extended the deadline for the Coleman Group to submit final written comments regarding the City of Bossier City's Implementation Plan for the Redevelopment Districts until August 14, 2015.  See Record Document 460.  The Court advised that no further extensions would be granted and that any filings received after August 14, 2015 would not be considered by the Court.  See id.

In July 2015, the Coleman Plaintiffs filed two motions, one of which was exclusively addressed to redevelopment.  See Record Documents 458 & 459.  The Court held a July 22, 2015 status conference to discuss the motions.  See Record Document 464.  Both motions were stayed pending a follow up status conference set for August 28, 2015.  See id.  The Court again reminded U.L. Coleman, III ("Coleman"), President of the U.L. Coleman Company, Ltd., that final written comments regarding the City's Implementation Plan for the Redevelopment Districts were due August 15, 2015.  See id.

On July 24, 2015, the Coleman Plaintiffs moved to withdraw their two motions (Record Documents 458 & 459).  Their motions to withdraw were granted by this Court on July 27, 2015.  See Record Documents 465 & 466.  The Coleman Plaintiffs then filed a revised Motion to Enforce Consent Decree and Cooperative Endeavor Agreement.  See Record Document 462.  The revised motion was likewise stayed pending a follow up status conference set for August 28, 2015.  See Record Document 469.

On August 28, 2015, the Court held a construction progress meeting and a status conference.  See Record Documents 470, 471 & 473.  During the status conference, the Court discussed the revised Motion to Enforce Consent Decree and Cooperative Endeavor

Agreement (Record Document 462), including the "Todd Meyer matrix"[5] submitted by the Coleman Plaintiffs.   See Record Document 471.   Counsel for the Coleman Plaintiffs admitted that the issues presented in the matrix were broader than the issues presented in the revised motion; thus, the Coleman Plaintiffs' revised motion was denied as moot. See id.  The Court ordered that all counsel and the key individual parties meet on August 29, 2015 in an attempt to resolve all issues surrounding the City's Implementation Plan for the Redevelopment Districts.   See id.   The Court directed counsel to file a Joint Status Report outlining any progress made at the meeting.   See id.  If issues remained after the meeting, the Coleman Plaintiffs were ordered to file a new motion presenting any and all remaining issues relating to redevelopment districts.   See id.   Finally, the Court stayed all action on the redevelopment district pending further order of the Court.   See id.[6]

––––––––––––––––––––

[5]As previously stated, the Court had ordered the Coleman Plaintiffs to submit final written comments regarding the Implementation Plan no later than August 15, 2015.  The Coleman Plaintiffs provided "preliminary" comments to the City on August 14, 2015.  See Record Document 518 at 396.  The City prepared responses.  See City Exhibit 24.
        Todd Meyer of the Forum Group prepared the Implementation Plan Comment/Action Item Matrix on August 26, 2015 and it was submitted to the City and the Court in preparation for the August 28, 2015 conference.  See Record Document 517 at 20-23; Joint Hearing Exhibit 3.  The Coleman Plaintiffs termed the matrix as a preliminary response; yet, during the November 2015 hearing, the Court deemed the matrix as the Coleman Plaintiffs' final comments on the Implementation Plan.  See id. at 22-23. Moreover, the Court notes that the Coleman Plaintiffs' first two Motions to Enforce (Record Documents 459 & 462) were filed even before the Coleman Plaintiffs presented any comments to the Implementation Plan.  The aforementioned actions on the part of the Coleman Plaintiffs do not appear to be in the spirit of consultation, in good faith and in full cooperation, as required by Section 3.04 of the CEA.

[6]During the November 2015 hearing, the Court explained that the stay entered "was for the protection of both parties so that there would not be potentially useless work" performed depending upon the findings of the Court.  Record Document 518 at 421.  The limited exception to the stay was the City's ability to move forward with the 2016 budgeting process.  See id. at 422.  The Court hereby takes judicial notice of Ordinance No. 29 of 2016, which was adopted by the City Council on April 5, 2016.  The City Council appropriated $1.9 million for South Bossier Redevelopment.

The parties were not able to agree upon a Joint Status Report outlining the progress made at the August 29, 2015 conference.  See Record Document 477.  Instead, the parties timely submitted individual reports on September 3, 2015.  See id.  Because all issues relating to the redevelopment districts were not resolved, the Court ordered that the stay relating to all action on the redevelopment districts remain in place.  See id.

On September 4, 2015, the Coleman Plaintiffs filed the instant Motion to Enforce Consent Decree and Cooperative Endeavor Agreement.  See Record Document 475.[7] The Court set the Coleman Plaintiffs' Motion to Enforce Consent Decree and Cooperative Endeavor Agreement for hearing on November 19-20, 2015.  See Record Document 477. In preparation for the hearing, the Court made several evidentiary rulings:

**A.    Redevelopment District Boundaries.**

In an October 1, 2015 Memorandum Order, the Court sustained the City's objections as to the redevelopment district boundaries, holding:

> As evidenced by the official minutes, this Court held that the required boundaries/districts of the Redevelopment Districts include only subdistricts 1 and 2 of the diagram. See Record Document 471-5 at 2 (4.01); Record Document 453 at 2.

Record Document 492 at 1.  The Court also granted the City's Rule 12(f) Motion to Strike, Motion for Protective Order, or, in the Alternative, Motion in Limine stating:

> The boundary issue has been decided, as this Court has held on at least three occasions that the district boundaries for the Redevelopment Districts at issue are limited to sub-districts 1 and 2 of the SWA Final Plan. See Record Documents 471-5 at 2; 453 at 2; and 492 at 1.  Plaintiffs' request for reconsideration of this ruling is **DENIED**.  See Record Document 494 at 8.  Accordingly, the Motion to Strike and the Motion for Protective

---

[7]The Coleman Plaintiffs also filed a Motion to Appoint Special Master.  See Record Document 476.  The Court deferred ruling on the Motion to Appoint Special Master until after resolution of the Motion to Enforce Consent Decree and Cooperative Endeavor Agreement.  See Record Document 477.

> Order are **GRANTED** as to the boundary issue. All argument on the boundaries for the two Redevelopment Districts, and discovery relating thereto, are to be stricken from Record Documents 475 and 475-1. Additionally, Plaintiffs are precluded from seeking discovery in this litigation on the determination of the boundaries from the two Redevelopment Districts at issue.

Record Document 500 at 4-5.

### B.  Minimal Effort.

The City objected to the Coleman Plaintiffs' attempt to seek discovery regarding "the action of city officials to only make the minimal effort in pushing forward with the redevelopment districts." Record Document 486-3 at 1. The Court sustained such objection, holding "the relevant issue is compliance with the consultation provision of Section 3.04 of the Cooperative Endeavor Agreement for Walker Place Community Benefits . . . , not 'minimal effort.'" Record Document 492 at 2; see also Record Document 500 ("As stated in a previous ruling, it is this Court's belief that the relevant issue at this stage is compliance with the consultation provision of Section 3.04 of the CEA, not 'minimal effort' versus 'complete commitment.'").

### C.  Volkert, Inc.

In an October 1, 2015 Memorandum Order, the Court sustained the City's objections relating to Volkert Engineering, holding that "this Court approved Volkert Engineering, a national firm, for preparation of the Implementation Plan." Record Document 492 at 2.

### D.  Comparative Economic Development Efforts.

The Court granted the City's Rule 12(f) Motion to Strike, Motion for Protective Order, or, in the Alternative, Motion in Limine in relation to comparative economic development efforts, stating:

> Under Rule 12(f), this Court holds that Plaintiffs' comparative

economic development efforts are immaterial and impertinent to the issues currently before this Court. . . .  As stated in a previous ruling, it is this Court's belief that the relevant issue at this stage is compliance with the consultation provision of Section 3.04 of the CEA, not "minimal effort" versus "complete commitment."  Thus, Plaintiffs' implied argument that progress on one City economic development project is necessarily at the expense of the two Redevelopment Districts is immaterial to the issue of whether the City has consulted in good faith and in full cooperation with Plaintiffs on the development of the Barksdale Boulevard Redevelopment District and the Barksdale South Neighborhood Redevelopment District. . . .

Likewise, at this stage, the Court finds that discovery on the issue of comparative economic redevelopment efforts is neither relevant, material, nor reasonably calculated to lead to the discovery of admissible evidence. This Court had previously deferred ruling on the City's objections to Plaintiffs' Notices of Depositions relating to Areas 7-15.  See Record Document 492 at 2. The City's objections to Areas 7-15 are now **SUSTAINED**.

Based on the foregoing, the Motion to Strike and the Motion for Protective Order are **GRANTED** as to comparative economic redevelopment efforts.  All references to economic development projects in areas of Bossier City other than South Bossier, including downtown, and discovery relating thereto, are to be stricken from Record Documents 475 and 475-1. Additionally, Plaintiffs are precluded from seeking discovery in this litigation on the City's economic development efforts in other areas of Bossier City, including the Downtown Bossier City Re-Envisioning Plan.

Record Document 500 at 3-4.

### E.    Opinions of Todd Meyer.

During a November 10, 2015 telephone status conference, the Court orally granted in the alternative the City's Motion in Limine to Exclude Opinions of Todd O. Meyer under Federal Rule of Evidence 702.  See Record Documents 498 & 505.  The Court held that Todd Meyer's ("Meyer") opinions about purported best practices and alleged deficiencies in the City's Implementation Plan are at least marginally relevant to the issues to be decided by the Court, namely the City's obligation to consult in good faith and in full cooperation. See Record Document 505 at 1-2.  However, the Court limited Meyer's opinion testimony at the November 19-20, 2015 hearing "to the opinions offered in his

affidavit and matrix filed in the record" because Meyer would not be issuing an expert report.  Id. at 2, citing Record Documents 493-5 & 493-8.  In accordance with previous orders, the Court excluded any information contained in Meyer's affidavit or matrix relating to comparative economic redevelopment efforts and/or the boundaries of the two Redevelopment Districts.  See id. at 2.

## II.    LAW AND ANALYSIS.

### A.    Legal Standards.

The Consent Decree in this matter is a court order.  See Record Document 423. The Coleman Plaintiffs have asked this Court to require the City to perform certain acts under the Consent Decree and the CEA.  To succeed, the Coleman Plaintiffs must show by clear and convincing evidence that the City failed to comply with the terms of the Consent Decree and the CEA, thereby placing the City in contempt of the Consent Decree. See Hornbeck Offshore Servs., L.L.C. v. Salazar, 713 F.3d 787, 792 (5th Cir. 2013); Travelhost, Inc. v. Blandford, 68 F.3d 958, 961 (5th Cir. 1995); Am. Airlines, Inc. v. Allied Pilots Ass'n, 228 F.3d 574, 581 (5th Cir. 2000).

The CEA provides that "this agreement shall be governed by and construed in accordance with the laws of Louisiana." Record Document 424 at Article I, Section 1.03(g). Thus, this Court must look to Louisiana's rules of contractual interpretation.  "Under Louisiana law, a contract is the law between the parties, and is read for its plain meaning." Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Circle, Inc., 915 F.2d 986, 989 (5th Cir. 1990) (internal citation omitted).  Louisiana Civil Code Article 2046 further provides, "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."  La. C.C. Art. 2046.  Simply put, "where the words of a contract are clear and explicit and lead to no absurd

consequences, the contract's meaning and the intent of its parties must be sought within the four corners of the document and cannot be explained or contradicted by extrinsic evidence." Am. Totalisator Co. v. Fair Grounds Corp., 3 F.3d 810, 813 (5th Cir. 1993), citing La C.C. Art. 2046; Billingsley v. Bach Energy Corp., 588 So.2d 786, 790 (La.App. 2nd Cir.1991). "This established rule of strict construction does not allow the parties to create an ambiguity where none exists and does not authorize courts to create new contractual obligations where the language of the written document clearly expresses the intent of the parties." Omnitech Int'l, Inc. v. Clorox Co., 11 F.3d 1316, 1326 (5th Cir. 1994).

Pursuant to Louisiana Civil Code Article 2047, contracts containing technical words and terms of art must be given technical meaning when "the contract involves a technical matter." La. C.C. Art. 2047. "Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract." La. C.C. Art. 2048. "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." La. C.C. Art.2053; see also Red River Parish Port Comm'n v. Headwaters Res. Inc., 698 F.Supp.2d 684, 689 (W.D.La.2010). The question of whether ambiguity exists in a contract's language is a question of law for a court when it is unclear, susceptible to more than one reasonable interpretation, or the parties' intent cannot be ascertained. See Red River Parish Port Comm'n, 698 F.Supp.2d at 689.

If the Court determines that certain contractual provisions are ambiguous and the intent of the parties could not be ascertained, Louisiana law permits the Court to consider the custom of the particular field to determine the true intent of the parties, as well as extrinsic evidence, including expert testimony, to determine such industry customs. See

Henry v. Ballard & Cordell Corp., 418 So.2d 1334, 1340 (La.1982).  The Fifth Circuit, when applying Louisiana contract law, has also held that the admission of expert testimony from an individual experienced in a particular field to explain technical meaning of terms is "prudent."  Phillips Oil Co. v. OKC Corp., 812 F.2d 265, 281 (5th Cir.1987) (finding it was consistent with Louisiana Civil Code Article 2047 and Federal Rule of Evidence 702 to permit expert testimony by an oil and gas accountant). The Fifth Circuit noted, "What better way is there to discover the technical meaning than through the use of Federal Rule of Evidence 702."  Id. at 282.

**B.    Analysis.**

The Coleman Plaintiffs argue that the City is not in good faith in the creation and implementation plan for the two Redevelopment Districts.  See Record Document 475 at 4.  The Coleman Plaintiffs also assert that pursuant to the terms of the CEA, the City is required to permit SWA to complete the Preliminary Conceptual Master Plan.  See id. at 5.[8]  They request that the Court require the City to re-engage SWA to complete the Conceptual Master Plan as well as the Implementation Plan.  See id.  The Coleman Plaintiffs advance the following arguments, which are specific to their contention that the City has not used best planning guidelines and practices in relation to the creation and implementation of the two Redevelopment Districts":

• The Codes and Ordinances applicable to the Redevelopment Districts;

• The composure of the Redevelopment District Committee;

• The duties and responsibilities of the Redevelopment District Committee;

---

[8]The SWA Plan is Joint Exhibit 1 and is entitled "Barksdale Boulevard Corridor, Bossier City, Louisiana, Conceptual Redevelopment Plan, September 2014."

- The frequency of meetings of the Redevelopment District Committee;

- The self regulation of the Barksdale South Neighborhood Redevelopment District;

- Funding for the Performance of the Redevelopment District Committee;

- Implementation schedule to allow the Redevelopment Districts to Function;

- Funding for the Barksdale Boulevard Redevelopment District Capital Projects; and

- Funding for the Barksdale South Neighborhood Redevelopment District Capital Projects.

Record Document 475-1 at 6-11. The Coleman Plaintiffs maintain that "the actions of the City show that its commitment to the implementation of the Redevelopment Districts called for in the CEA is to do as little as it is required to do by the Court." Id. at 11. The Coleman Plaintiffs expected a "good faith commitment and effort" by the City and "would never have signed the CEA had [they] known that the City was going to ultimately do its best to minimize its obligations under the CEA and ignore sound planning principles in [its] implementation of the Redevelopment Districts." Id. at 11-12.

It is this Court's belief that two key provisions of the CEA guide its decision making in relation to the instant motion:

> **"Redevelopment District"** means a geographical demarcated area within which certain **best planning guidelines and practices** are implemented, home ownership is encouraged, and certain public incentives, such as tax benefits and funding opportunities, are made available.

. . .

> **3.04. Consultation.** The Parties agree to consult one another, in good faith and in full cooperation, in the execution of the obligations of the Parties, as described in this Article III. Further, the City agrees to allow Coleman the opportunity to review and provide comments to the Project Plans prior to their finalization, which comments the City shall take into full, good faith

consideration.

Record Document 424 at 5, 10 (emphasis added).  At the outset, this Court holds that while it is clear that any "Redevelopment District" is to be a geographical demarcated area, the term "Redevelopment District" and the phrase "best planning guidelines and practices" are ambiguous.  These words and phrases are technical and terms of art within the industry, that is, land planning and redevelopment.  The Court will consider extrinsic evidence, namely the expert testimony of Meyer and Micah Wood ("Wood"), to determine the intent of the parties and the customs in the fields of land planning and redevelopment.

Conversely, the Court believes that the consultation provision set forth in Section 3.04 is clear and explicit and leads to no absurd consequences.  This provision needs no further explanation by extrinsic evidence.  It is clear to this Court that the consultation requirements relating to redevelopment differ than those relating to the "Project Plans." Again, the "Project Plans" relate to the public park and the pedestrian and bicycle pathway. Redevelopment districts, whether it be creation or implementation of such districts, are not included within the definition of Project Plans.  Thus, Section 3.04's provision allowing the Coleman Plaintiffs "to review and provide comments . . . prior to finalization" and for the City to take such comments "into full, good faith consideration" does not apply to the Redevelopment Districts.  Any other interpretation of Section 3.04 would be a "perversion of language or the creation of ambiguity where none exists."  Ransom v. Camcraft, Inc., 580 So.2d 1073, 1077 (La.App. 4th Cir.1991); see also Baber v. Hoffer, 430 So.2d 220, 221 (La.App. 4th Cir.1983) ("When a clause of a contract is clear and unambiguous, the letter of it should not be disregarded under the pretext of pursuing the spirit.").  Simply put, the City's obligation as to the Redevelopment Districts is to consult the Coleman Plaintiffs, in good faith and in full cooperation, in order to fulfill its obligations to create and enact the

Redevelopment Districts.   In the context of the creation and implementation of the Redevelopment Districts, the CEA does not require the City to allow the Coleman Plaintiffs the opportunity to review and provide comments prior to finalization, nor does the CEA impose upon the City the need to take any such comments into full, good faith consideration.  As noted in the CEA, each of the parties had the opportunity to negotiate the language of the agreement in consultation with legal counsel.  See Record Document 424 at 1.03(d).  The CEA was an arms length negotiation and any further interpretation of Section 3.04 would be a perversion of the clear contractual language and the creation of ambiguity where none exists.

### 1.   The SWA Conceptual Redevelopment Plan and the Engagement of Volkert, Inc. for the Implementation Plan.

The Court will first address the Coleman Plaintiffs' contention that under the terms of the CEA, the City should be required to re-engage SWA to complete the Conceptual Redevelopment Plan (Joint Exhibit 1) as well as the Implementation Plan.  During his testimony at the November 2015 hearing, Coleman testified that SWA was engaged to do a preliminary concept and that, in his opinion, SWA needed to complete a comprehensive master plan and embrace a broader concept as to the Redevelopment Districts.  See Record Document 517 at 19; Coleman Plaintiffs' Exhibit 7.  The Coleman Plaintiffs contend that SWA, not Volkert, Inc. ("Volkert"), was the "national design firm" that should have drafted plans and covenants, i.e., an implementation plan, under the terms of the CEA.

There is no dispute that in February 2014, the City formally engaged SWA for professional services in connection with the Redevelopment District master plan.  See City Exhibit 2;  see also Record Document 518 at 370.  The record further reflects that the Coleman Plaintiffs supported the engagement of SWA to provide design consultation

services for redevelopment.  See Plaintiffs' Exhibit 7.[9]  SWA was to prepare a series of planning studies and a report document defining the redevelopment goals and public investment objectives.  See City Exhibit 2.  The objective of SWA's services was "to provide an analysis if the existing conditions, a high-level market assessment, public sector investment strategy, land use plan, open space place, and conceptual redevelopment vision plans and conceptual public sector improvements to be considered by the City for further study or adoption."  Id.  SWA was to produce a Final Conceptual Redevelopment Plan including, among other things, "a phased implementation strategy to create a clear road map for execution of the proposed improvements."  Id.

In September 2014, SWA issued its Conceptual Redevelopment Plan, which included an implementation/phasing strategy, funding options, and a summary of recommendations, including short term improvements (5 years); mid term improvements (10 years); and long term improvements (15 years).  See Joint Exhibit 1 at 112 (Chapter 7), 124-127 (Chapter 8); Record Document 177 at 373.  In an email to Mike McSwain ("McSwain"), the City's Project Manager, Meyer, who served as SWA's Project Manager,[10] explained:

> Perhaps we need to do a better job of explaining that the planning study was meant to be a "menu of options" as opposed to a 'de facto' set of directives.
>
> Our approach was to generate an assortment of conceptual ideas for

_____

[9]In a letter dated November 21, 2013, Coleman acknowledged that "the actual national firm is a decision the City will have to make."  Plaintiffs' Exhibit 7.

[10]At the time of the hearing, Meyer was employed by the Forum Studio in Chicago.  See Record Document 517 at 96-97.  The Forum Studio is a design firm that offers services in architecture planning, landscape architecture, urban design, and technical assurance.  See id. at 96.  Meyer had previously been employed by SWA as a project director and the lead planner for the redevelopment district(s) at issue in this case.  See id. at 99.

improving the physical environment, some of which could be implemented over time.

It was never our intent that all of the recommendations be implemented all at once – i.e. the phasing strategy identifies near term, mid term and long term possibilities.

In the end, it is up to the City to prioritize which elements are most important to the community and then phase them in as funds are available from year to year.

City Exhibit 9.  In December 2014, SWA issued a Preliminary Cost Study based on recommendations in its September 2014 report.  See City Exhibit 10.  The cost study outlined costs for the short term, mid term and long term improvement recommendations, for a total investment of approximately $8.6 million.  See id.

During the November 2014 construction progress meeting, McSwain reported that the City was working with Brad Thompson from Volkert[11] to prepare a peer review of the recommended projects from the SWA Redevelopment District Study and an implementation plan for each of these projects including an outline of steps required to fund and implement the projects.  See Record Document 471-3 at 2; Record Document 483-2 at 11.  McSwain was to provide background information on Volkert and Brad Thompson.  See Record Document 471-3 at 3.[12]  The minutes also reference "next steps":

[The City] to engage Volkert, Inc. and begin developing the implementation strategy.

Id.; see also Record Document 518 at 386.

Just prior to the start of the December 11, 2014 construction progress meeting,

---

[11]Brad Thompson, also an AICP certified planner, was the project manager for the Volkert Implementation Plan.  See Record Document 518 at 266.

[12]The City complied with this requirements and a copy of the background information on Volkert and Brad Thompson was attached to the official minutes.  See Record Document 471-3 at 3, 19-26; Record Document 518 at 387.

McSwain received an email from a project manager/architect of the U.L. Coleman Companies.  See Record Document 450; Record Document 518 at 388.  The email raised concerns regarding compliance with the CEA, more specifically the City's hiring of Volkert. See id.  The Court issued a minute entry, ordering:

> No later than 4:00 p.m. on Monday, December 15, 2014, counsel for the Coleman group shall notify the Court whether such statements are withdrawn or if compliance issues remain such that the Court needs to take further action.

Record Document 450.  At the December 11, 2014 construction progress meeting, McSwain provided an "update on Volkert progress on analysis of projects and implementation strategy."  Record Document 471-4 at 4.  More specifically, McSwain reported that the City was under contract with Volkert to prepare a peer review of the recommended projects from the SWA Redevelopment District Study and an implementation plan for each of these projects including an outline of steps required to fund and implement the projects.  See id.  "Mr. Coleman requested a standard Request for Qualifications (RFQ) Package from Volkert."  Id.  The City was to continue to work with Volkert and begin developing the implementation strategy.  See id.  McSwain testified at the hearing that ultimately, the parties "continued down the path with Volkert, and Judge Hicks . . . said it was going to be okay and let's keep going, this sounds like a good idea." Record Document 518 at 388.  The Coleman Plaintiffs failed to file any legal challenge to the City's engagement of Volkert by the Court's imposed deadline of December 15, 2014. See id. at 389.

The official minutes from the February 15, 2015 construction progress meeting indicate that Volkert's work on analysis and implementation strategy was to continue.  See Record Document 474-1 at 2.  The minutes also show that SWA was to provide

comparable examples and implementation strategies. <u>See id.</u>  The official minutes from the May 29, 2015 construction progress meeting indicate that Volkert had issued a proposed Implementation Strategy Matrix, <u>i.e.</u>, Implementation Plan.  <u>See</u> Record Document 471-5 at 4, 14-41; <u>see also</u> Joint Exhibit 2.  Coleman received a copy of the proposed Implementation Plan on May 26, 2015.  <u>See</u> Record Document 511 at ¶ 22.  Any comments from the Coleman Plaintiffs regarding the Implementation Plan and overall implementation strategy were due by June 12, 2015.  <u>See id.</u>  The Court noted that the redevelopment process could extend over many months.  <u>See id.</u>

In a June 12, 2015 letter to McSwain, Coleman requested that "SWA be continued as the Master Planner for the Redevelopment Districts."  City Exhibit 17; Record Document 518 at 393-394.  The official minutes of the June 29, 2015 construction progress meeting indicate that the Coleman Plaintiffs requested additional time to submit "FINAL written comments regarding the Implementation Plan for the redevelopment districts."  Record Document 456; Record Document 474-3 at 3.  The Court further ordered that "Mr. Coleman shall contact the Court as soon as possible to advise of how much time, not to exceed 28 days, is needed for his group's FINAL comments. . . . The Coleman Group is free to contact SWA for the purpose of retaining SWA for consultation in connection with the redevelopment districts."  Record Document 56; Record Document 518 at 394-395.  As stated <i>supra</i>, the Coleman Plaintiffs' deadline was extended until August 14, 2015.  <u>See</u> Record Document 469.

On August 14, 2015, the Coleman Plaintiffs provided "preliminary" comments regarding the proposed Implementation Plan.  <u>See</u> Record Document 511 at ¶ 25; Record Document 518 at 396.  The City requested a meeting with Coleman.  <u>See id.</u> at 397.  Such request was denied.  <u>See id.</u>  The City responded on August 21, 2015.  <u>See</u> City Exhibits

24 & 44; see also Record Document 518 at 396-398.  The Coleman Plaintiffs submitted new and additional comments to the City in the form of the matrix on August 28, 2015. See Record Document 470.  The Court received the matrix at the August 28, 2015 construction progress meeting and status conference.  See id.  Again, despite being labeled as preliminary, these comments were deemed final by the Court.  See Record Document 517 at 22-23.

Since August 2014, the process of redevelopment has been under the constant supervision of this Court.  The official minutes from the December 11, 2014 construction progress meeting evidence that Coleman wanted to provide input as to Volkert and "raised concerns about lack of continuity and required planning if SWA oversight were discontinued."  Record Document 471-4 at 4; see also Record Document 518 at 387.  The Court recalls Coleman's protestations regarding the engagement of Volkert, namely that it was an engineering firm, not a landscape architecture or planning firm.  See Record Document 518 at 387.  The Court further recalls the City's counter argument, which was based in part on Volkert's prior business/working relationship with the City.  See id.  At the hearing, McSwain testified that Volkert was a national firm and it employed planning staff and possessed expertise in the filed of land planning.  See id.  He explained that Volkert had experience in implementation strategies and had "local knowledge of the [City's] process, local familiarity with the MPC and how they work, and familiarity with the Comprehensive Plan."  Id. at 387, 390.  He also testified that Volkert had experience in drafting ordinances relating to redevelopment.  See id. at 385.  The Court recalls that similar explanations as to the City's preference to engage Volkert were provided during the construction progress meetings.  The official minutes of the construction progress meeting demonstrate that the Court was fully aware of not only the City's engagement of Volkert,

but also the Coleman Plaintiffs' objections to Volkert.  The Court allowed the City to move forward with its retention of Volkert and further notes that the Coleman Plaintiffs failed to file any legal challenge to the City's engagement of Volkert by the Court's imposed deadline of December 15, 2014.  In preparing for the November 2015 hearing in this matter, the Court sustained the City's objections relating to Volkert, holding that "this Court approved Volkert Engineering, a national firm, for preparation of the Implementation Plan." Record Document 492 at 2.  The Court reiterated this ruling during the hearing, stating:

> And the Court held that Volkert itself was a national firm with the expertise that the City needed as a consultant in order to move forward with the redevelopment districts.

Record Document 518 at 240.  Thus, this Court holds that the City's engagement of Volkert to draft the Implementation Plan was in full compliance with all provisions of the Consent Decree and the CEA.  While there may be disagreement amongst the parties as to whether SWA or Volkert was better suited to draft the Implementation Plan, disagreement does not equal breach of the Consent Decree or CEA.  Accordingly, the Coleman Plaintiffs' request for the Court to require the City to re-engage SWA to complete the Conceptual Master Plan as well as the Implementation Plan is **DENIED**.

### 2.    The Implementation Plan.

The Court will now move to the Coleman Plaintiffs' specific contentions regarding the deficiencies of the Implementation Plan.  The Court is guided by the following general considerations:  does the Implementation Plan create Redevelopment Districts as defined in the CEA; does the Implementation Plan employ best planning guidelines and practices; and has the City consulted the Coleman Plaintiffs, in good faith and in full cooperation, in the creation and implementation of the Redevelopment Districts, all as required by the CEA.

As stated *supra*, this Court has held that the term "Redevelopment District" and the phrase "best planning guidelines and practices" are ambiguous; thus, the Court will consider extrinsic evidence, including expert testimony, in its analysis of these terms.  The Coleman Plaintiffs presented the expert testimony of Meyer, who was accepted by the Court as an expert in the creation and implementation of redevelopment districts.  See Record Document 517 at 105, 115.  Meyer is not certified by the American Institute of Certified Planners ("AICP").  See id. at 105-106, 145.  Rather, he is a registered landscape architect and is accredited by Leadership in Energy and Environmental Design - Neighborhood Development ("LEED - ND"), which is a product of the U.S. Green Building Council.  See id. at 105, 160. Meyer is also accredited by the Congress for New Urbanism. See id.  The City presented the expert testimony of Wood, a land use planner certified by the AICP.  See Record Document 518 at 237, 239.  He is also a Senior Planner with Volkert in Franklin, Tennessee; thus, he was also called as a fact witness about the Implementation Plan.  See id. at 240, 243.  The Court accepted Wood as an expert planner with AICP certification.  See id. at 255, 266.  Wood explained the significance of his AICP certification:

> I received my AICP certification in 2007.  AICP is the – really, the only certification for practicing planners, both public and private, within the U.S. relating directly to the practice of planning. . . .  It is administered by the American Planning Association. . . .  There are requirements that are a combination of education and experience.
>
> . . .
>
> Also, part of the AICP certification, there's a continuing education requirement.  We're required to have 32 hours every two years; and to get that, you have to go to certified courses or conferences.  And during my continuing education requirement, I've been exposed to development and redevelopment districts.
>
> . . .

> The AICP certification is based on planners being a generalist. . . . So you really have to know – to be able to have AICP certification, you have to know kind of at least a little bit about a lot of different elements of the planning practice.

Id. at 244, 247, 252-253.

While lay witness testimony has played an important role in this Court's analysis, this case presents competing expert testimony as to the ambiguous terms in the CEA. Both experts are highly trained and experienced and both were subjected to vigorous cross-examination. The Court weighed their testimony and finds the City's expert to be more persuasive than the Coleman Plaintiffs' expert. As will be set forth in more detail infra, this Court believes that Wood's testimony, which was grounded in his AICP certification,[13] is more convincing than Meyer's testimony, which was based on the LEED and new urbanism principles. Wood explained that the source of his "best practices" was the American Planning Association, education, practical experience working in a variety of communities, and attending conferences, special workshops and seminars as required by his AICP certification. See Record Document 518 at 72 . The Court also heard testimony from Wood comparing and contrasting the AICP and LEED philosophies. Wood explained that he was not familiar with LEED-ND being used for a larger city-driven comprehensive planning project. See id. Rather, LEED-ND principles were more often used in the context of single private development. See id. He acknowledged that LEED-ND may be used for "a larger master plan development, but it's usually where all parcels are in common

---

[13]During the hearing, this Court remarked:

And it does seem to me that AICP is one of the sought-after but not required certifications in the field of planning.

Record Document 518 at 258.

ownership and the development is guided by a single overall developer." Id. at 272-273.[14] Based on his experience, Wood testified that the LEED-ND is "more of a developer-driven process than a community-driven process, from my experience." Id. at 273. Additionally, Wood explained that LEED is a sustainability effort "to provide for low-impact development, greener, more sustainable building practices and methods" and is used primarily for new development solely, not rehabilitation. Id.[15] Finally, Wood testified that his experience with the Congress for New Urbanism is that it "is very evangelical in [its] beliefs" – it believes its way is the only way in planning. Id. 273-274. As a whole, the Court believes the land planning philosophies espoused from the AICP certified planner are more in line with the best planning guidelines and practices applicable to redevelopment districts envisioned in the CEA.

Throughout the hearing, the Coleman Plaintiffs seemed to argue that the Implementation Plan was in conflict with the CEA because it created Overlay Districts as compared to Redevelopment Districts. During his testimony, Coleman stated that an "overlay district" may not be exactly the same thing as a redevelopment district "from a legal standpoint," but admitted the two are very similar. Record Document 517 at 7-8. The crux of Coleman's testimony was that the Volkert Implementation Plan does not provide for redevelopment districts consistent with the concept of redevelopment districts in the industry. See id. at 29. Meyer testified that the Implementation Plan did create

---

[14]Meyer testified that "in a redevelopment district, you don't have common ownership, meaning the whole district is not owned by one entity, it's owned by many entities." Record Document 517 at 167.

[15]In a December 2013 planning meeting with the City and SWA, "UL Coleman indicate[d] that Coleman is not in the business of tearing down existing structures for redevelopment." Record Document 518 at 372; City Exhibit 1.

"Redevelopment Districts" because the plan focused on capital development/improvement projects and did not contain guidelines as to how private development should ultimately evolve. <u>See</u> Record Document 517 at 122.[16]

Here, the Implementation Plan clearly uses both "Redevelopment District" and Redevelopment District Overlay." Joint Exhibit 2. Wood testified that he had reviewed the definition of Redevelopment District in the CEA and explained that "communities' planning terms differ greatly from one community to the next. Record Document 518 at 254.263. Conversely, Meyer testified that in his critique of the Implementation Plan he was speaking only of redevelopment districts generally and not specifically under the CEA. <u>See</u> Record Document 517 at 108. According to Wood, the way one community calls a 'character area' could be called a 'redevelopment district' within another community." Record Document 518 at 263. He went on to explain:

> One community may call a planning, geographical planning area, a "redevelopment district." And I've never worked in a community that called it specifically that, but I have worked in similar situations where there's comprehensive planning going on for a character area or planning sector, and then worked on Implementation towards the goals and objectives of the plan for that geographical area.

<u>Id.</u> at 264.[17] He also testified that the City's prior use of "overlay districts" in the context of the Unified Development Code and the City's Comprehensive Plan guided Volkert in its inclusion of "overlay zones for the two areas mentioned in the [CEA]":

---

[16]The City's expert sufficiently countered this argument by explaining that "the regulation or motivation of private development activities" would be covered under the regulations in the overlay districts. Record Document 518 at 325-326.

[17]The Court notes that Wood's explanation matches closely with William Cole Guthrie's ("Guthrie") testimony at the hearing. Guthrie, a landscape architect and Vice President of Development for the U.L. Coleman Companies, testified that redevelopment is basically repositioning something that has already been built, and "Other planning aspects of that nature." Record Document 518 at 202.

And so as we were crafting the [I]mplementation [P]lan, we determined that the best planning practice would be one that the City already has familiarity with and understands how to implement and execute.

Id. at 270.[18]  The Court accepts Wood's testimony that there is "not one objective definition" of a redevelopment district, as land planning is "very community-specific" and definitions will vary from community to community.   Id. at 310.   The Court further believes that redevelopment districts and overlay districts are not mutually exclusive.   Thus, based on the foregoing, this Court holds that the Implementation Plan's reference to overlay districts does not conflict with the CEA and conforms with best planning guidelines and practices, as required by the CEA.[19]

The Implementation Plan specifically incorporates the City's Unified Development Code, the SWA Conceptual Redevelopment Plan, and the SWA Preliminary Cost Study. See Joint Exhibit 2 at 7-9.  When asked if the Implementation Plan drafted by Volkert met the goals stated in the SWA Conceptual Redevelopment Plan, Meyer admitted that the Implementation Plan "does some of those things, yes."   Record Document 517 at 154. Wood testified that Volkert used the SWA Conceptual Redevelopment Plan, the City's Comprehensive Plan, and the CEA when drafting the Implementation Plan.  See Record Document 518 at 329-330.   During the hearing, the City also noted that the SWA

_____

[18]In December 2013, before the City actually signed a contract with SWA, there was a meeting to discuss SWA's scope of work as to redevelopment.  See Record Document 518 at 372; City Exhibit 1.  The minutes from this meeting indicate there was a discussion on planning studies, wherein the City stated that it saw "the Barksdale Redevelopment District as an overlay district to existing studies and guidelines."  Id.

[19]As noted previously, the CEA notes that each of the parties had an opportunity to negotiate the language of the agreement in consultation with legal counsel.  See Record Document 424 at 1.03(d).  The parties were free to further define "Redevelopment District," whether it was to include a reference to new urbanism, form-based codes, or overlay districts.  However, the parties missed this opportunity and the Court was left to weigh expert testimony to determine the technical meaning of "Redevelopment District."

Conceptual Redevelopment Plan provides:

> There are many ways in which the redevelopment plan can be implemented. Below is a suggestion of how to proceed with improvements that work together to achieve the goals and objectives prescribed early in the planning process.

Joint Exhibit 1 at 126; Record Document 518 at 337.  Based on these facts, the Court holds that Volkert, in drafting the Implementation Plan, consulted and was guided by the SWA Conceptual Redevelopment Plan, as required by Article III, Section 3.03(c) and (d) of the CEA.  See Record Document 424.

The Coleman Plaintiffs have focused on four primary areas as evidence that (1) the City lacks good faith in the creation of the Redevelopment Districts and (2) the Implementation Plan does not conform with best planning guidelines and practices.  The Court will address each of these contentions separately, but as a whole finds that the Implementation Plan employs best planning guidelines and practices.  This Court notes that its ruling is, in part, based upon the stage of the redevelopment process, as even the Coleman Plaintiffs' expert stated that the City is "at the early stages of the implementation of [the] redevelopment districts."  Record Document 517 at 162.

### a. The Codes and Ordinances applicable to the Redevelopment Districts.

Meyer's matrix critiques the Implementation Plan and requests the following action as to codes and ordinances:

> Codes/Ordinances: Prepare codes, ordinances, guidelines or pattern books for the redevelopment district(s) that prescribe high-quality public-sector improvements and private development.  A form-based code overlay will be the most effective way to achieve this and realize the vision of high-quality urban development established in the conceptual plan.

> Form-Based Code:[20] The City should implement a form-based code overlay, design guidelines or a pattern book for the redevelopment district(s).  These tools remove complexity and ambiguity in conventional codes and ordinances and replace them with high descriptive regulations that are easy to understand and implement.
>
> City-Wide Architectural Standards:   Meyer maintains that architectural standards should be incorporated as part of the form-based code overlay, which should be specifically created for the redevelopment district(s).

Coleman Plaintiffs' Exhibit 3.  At the hearing, Meyer testified that the Implementation Plan does not have any kind of ordinance, code or guideline about how private development should ultimately evolve.  See Record Document 517 at 122.  He discounted the City's new architectural standards because they are based on "conventional Euclidean zoning codes [that] have led us to a type of suburban sprawl . . . development" that should not be an aspiration for South Bossier."  Id. at 124.[21]  Meyer considers form-based codes to be best practices.  See id. at 128.  Mirroring Meyer's concerns, Guthrie testified that he did not believe that the Implementation Plan addressed the SWA Conceptual Redevelopment Plan and believed the proposed ordinances are "disappointing" because they only address three items: driveway width restriction, a buffer along Barksdale Boulevard, and parking

---

[20]According to Meyer, form-based codes focus on size, shape and placement of buildings and parking and "where they are relative to thoroughfares and the form of that building, recognizing that those buildings will probably change use sometime in their lifetime."  Record Document 517 at 125.  Wood described form-based codes as a "critique of Euclidian zoning which is use-based."  Record Document 518 at 278.  Wood explained that form-based codes emphasize the "built environment, the urban form, and how things look rather than how things are actually utilized or used as the actual land use."  Id.

[21]According to Meyer, Euclidian zoning practices and plans are conventional types of codes that promote horizontal, separate land uses; lots of parking; require people to drive long distances between uses; require more costs for infrastructure and maintenance of such infrastructure.  See Record Document 517 at 125.  Euclidian zoning codes normally regulate land use and density.  See id.  Wood testified that under Euclidian style codes, buildings are farther back from the thoroughfare.  See Record Document 518 at 277.

reduction.  See Record Document 517 at 210, 212.

In its August 21, 2015 response to the Coleman Plaintiffs' comments, the City addressed the Coleman Plaintiffs' concerns as to ordinances and, in fact, drafted a new ordinance entitled "An Ordinance to Create and Enact the Barksdale Boulevard Redevelopment District and Barksdale South Neighborhood Redevelopment District as well as Establish the Barksdale Redevelopment District Committee."  City Exhibit 24, Appendix 3.[22]  Meyer admitted that he had not reviewed the new, "so-called umbrella ordinance."  Record Document 517 at 168-169.  Yet, Wood testified that this new proposed ordinance was "the next step" and that it would effectuate both the SWA Conceptual Redevelopment Plan and the Implementation Plan.  See Record Document 518 at 269.

It is this Court's finding that the City's proposed umbrella ordinance is in line with Volkert's suggested next step in the Implementation Plan, that is, to start the capital projects.  The Court believes that the passage of the umbrella ordinance is what is needed to get the redevelopment districts up and running.  The City's proposed ordinance creates the redevelopment districts and a redevelopment committee for the Barksdale Boulevard Redevelopment District.  See City Exhibit 24, Appendix 3.  It also calls for the City's redevelopment efforts to be lead by the Bossier MPC and anticipates the need for additional MPC staff or outside consultants.  See id.  The proposed ordinance incorporates SWA's Preliminary Cost Study and acknowledges appropriations to be made to fund the phased implementation.  See id.  The proposed ordinance specifically references the City's 5-year Capital Projects Plan and the City Council's appropriation of funds in its annual

_____

[22]The City's response to the Coleman Plaintiffs' comments is evidence of the City's consultation, in good faith and in full cooperation, in the creation and implementation of the Redevelopment Districts.

budget.  <u>See id.</u>  The proposed ordinance includes action items for one or more neighborhood conservation overlay districts in the Barksdale South Neighborhood Redevelopment District and the adoption of a zoning overlay district for the Barksdale Boulevard Redevelopment District.  <u>See id.</u>  The umbrella ordinance will, at a minimum, initiate the redevelopment process, such that capital project plans and neighborhood plans can begin.  It is for these reasons that the Court holds that the umbrella ordinance is in line with best planning guidelines and practices.

The Court likewise holds that the use of a hybrid code, with elements of both Euclidean and form-based codes, in the Implementation Plan complies with best planning guidelines and practices.[23]  Wood explained that Volkert considered a form-based code in drafting the Implementation Plan, but rejected it as "being overly complex for the implementation of goals and objective of the SWA Plan since the City already had basically best planning practices through the use of overlay zones already as a tool in their UDC."  Record Document 518 at 275.  Wood testified that it is very complex to get developments and redevelopments through the approval process in a form-based code.  <u>See id.</u> at 276.  Wood also noted that one of the primary reasons Volkert rejected a form-based code as an implementation tool for the SWA Plan was because part of the area at issue was a suburban highway commercial corridor.  <u>See id.</u> at 279.  He explained it would be better

_____

[23]Wood explained that the areas covered by the two redevelopment districts are now considered Euclidian zoning areas.  <u>See</u> Record Document 518 at 290. As part of the proposed umbrella ordinance, the City has also drafted an ordinance to amend the UDC in relation to the Barksdale Boulevard Redevelopment Overlay District.  <u>See</u> City Exhibit at 56-58.  This ordinance calls for modification by three components, <u>i.e.</u>, landscaping/buffering requirements; driveway spacing; and reduction in parking requirements in exchange for cross access easements.  <u>See id.</u>  According to Wood, the results of these modifications will be more of a hybrid zoning approach.  <u>See id.</u> at 285, 290.

to use a "hybrid zoning tool to implement incremental change over time as development and redevelopment occurs along that corridor," rather than going back in and establishing the form-based code based off of existing development.  Id.  The City would be able to have the "hybrid result" with certain form-based elements as part of the overlay districts. See id. at 316.  Wood also noted that in light of the City's new architectural standards, the City is moving in the direction of a hybrid code citywide.  See id. at 290.

Moreover, when questioned by the Court, Meyer admitted that hybrid codes are often used "where a city is not necessarily ready to give up the conventional code and they're not necessarily ready to just bring in a pure form-based code, and so you have a hybrid of the two coming together.  And that can happen for a district, a corridor, a neighborhood.  The scale is irrelevant."  Record Document 517 at 141.  He also admitted that conventional/Euclidian codes are "the standard" around the country; yet, in his opinion, they are not best practices or best planning.  Id. at 144.  Meyer conceded that the SWA Conceptual Redevelopment Plan makes no mention of any required drafting and adoption of any land use regulatory ordinances by the City and that there is no mention in the summary of recommendations of any form-based code.  See id. at 158.  Meyer further admitted that while he believed "that the U.S. Green Building Council is the most widely accepted standard or criteria by which projects are . . . judged in terms of sustainability," there was nothing in the CEA that required LEED-ND standards as the best practices to be followed.  Id. at 161.  Based on the reasons set forth above, this Court holds that the use of a hybrid code, with elements of both Euclidian and form-based codes, is in line with best planning guidelines and practices.

**b.    The Barksdale Boulevard Redevelopment District Committee.**

Meyer's matrix critiques various aspects of the Redevelopment District Committee

relating to composition, duties and responsibilities, and frequency of meetings:

> Redevelopment District Committee: The committee needs to include a diverse and independent group.  The committee shall include seven members – three members appointed by the City (non-elected officials); the president of the South Bossier Assembly; the president of the NW Louisiana Economic Partnership; the president/CEO of The Center for Planning Excellence in Baton Rouge; and one representative from UL Coleman Companies.
>
> Committee Responsibility: The committee shall meet to discuss district business, new initiatives, review and approve infrastructure projects as proposed by the City, review and approve proposed development projects by private parties and assess progress on current initiatives as established by the district.
>
> Committee Meetings: The committee shall meet once per month.  The district committee should also have the right to convene 'emergency' sessions in order to address the needs of the City or private entities between the standard monthly meeting dates.

Coleman Plaintiffs' Exhibit 3.  At the hearing, Meyer testified that the committee was subject to political influences as to agendas and the Implementation Plan did not provide best practices in terms of committee makeup, responsibility and authority.  See Record Document 517 at 132, 142.

Mr. Coleman and Guthrie likewise expressed concern about the committee. Coleman critiqued that the governance of the committee is city-appointed; the makeup of the committee does not promote independence; the committee lacks authority; and the committee only meets twice a year.  See Record Document 517 at 29, 33-34.  Guthrie testified that it is his belief that the committee is simply a "recommendation committee"; the committee has no authority and no power; and the decision making remains with the City Council.  Record Document 518 at 230.

In light of the history of this litigation, the Court has reviewed the issues relating to the Barksdale Redevelopment District Committee with a critical eye to ensure a level of

independence.  While there is simply no way to guarantee that local politics will not influence the committee and its actions, the Court believes that the City's August 21, 2015 responses relating to the committee evidence good faith.  Additionally, the Court finds that the testimony at the hearing established that much of Meyer's critiques relating to the committee appeared to be based upon his opinion that the CEA called for more of a redevelopment authority created by state legislation.  See Record Document 517 at 172. Yet, as explained by Wood, independent redevelopment authorities are associated with a housing authority or a downtown redevelopment authority in a very urban environment. See Record Document 518 at 295.  Such independent authorities are more common when federal monies or grants are involved and are more unusual for a small area planning district.  See id. at 295, 334.

Moreover, in its August 2015 response, the City agreed with the Coleman Plaintiffs' concerns regarding a better defined role for the committee and the need for revised membership for the committee.  See City Exhibit 24 at 2.[24]  The proposed umbrella ordinance will establish the committee.  See id.  The membership was revised to 9 members (instead of seven) and includes:  three citizens (instead of two) appointed by the Mayor, three members from the City (none are elected officials), and three other members (a representative of U.L. Coleman Companies, the Community Planner of Barksdale Air Force Base, and the Executive Director of the Bossier Economic Development Foundation).  See id.  Likewise, the City agreed that the committee should hold regular meetings, no less than twice annually, and special meetings.  See Record Document 517

---

[24]McSwain testified that the intent of the City's response as to the committee was to make it a diverse, balanced group with varying levels of local knowledge.  See Record Document 518 at 398.

at 174.  The committee otherwise will be in the best position to determine the frequency of its meetings and its agenda as its work develops.  See id.  The Court therefore finds that the City's responses as to the committee and the proposed umbrella ordinance are in line with best planning guidelines and practices.

### c.   Funding.

The Coleman Plaintiffs argue that the Implementation Plan does not provide adequate funding for the performance of the Barksdale Boulevard Redevelopment District Committee or for capital projects in the Barksdale Boulevard Redevelopment District and the Barksdale South Neighborhood Redevelopment District.  Meyer's matrix specifically suggests that the City should review funding options and be proactive in pursuing funding options; explore the option of establishing tax increment financing ("TIF"); and formulating and adopting a plan to fund the redevelopment committee, capital improvements, infrastructure projects and maintenance.  See Coleman Plaintiffs' Exhibit 3.

At the hearing, Meyer testified that the Implementation Plan provided no funding mechanisms such as levying taxes or floating municipal bonds.  See Record Document 517 at 132.  He noted that the redevelopment committee would only get money from the City.  See id. at 133.  He also noted that the Implementation Plan did not provide funding for the committees to retain consultants, land planners and other professionals.  See id.  He noted that the Implementation Plan did not discuss long term or recurring budgets over time.  See id. at 135.  Coleman shared these concerns, stating that there was no funding and no tax incentive programs or methodology for public-private financing.  See Record Document 517 at 29.  Coleman further questioned the financial commitment of the City and noted that redevelopment has been a "very reluctant process."  Id. at 36-37.

In its August 21, 2015 response, the City addressed funding, namely Meyer's

suggestion of TIF funding.  See City Exhibit 24 at 3, 39-40.  The City acknowledges that SWA mentioned TIF in its Conceptual Redevelopment Plan.  However, the City notes that the necessary city-wide vote for adoption of such funding for the redevelopment districts is a serious limitation:

> This is a serious limitation that SWA failed to consider when it included TIF funding as a potential source of revenues for implementation of its projects in the South Bossier Redevelopment Districts.

City Exhibit 24 at 40.

> The proposed umbrella ordinance provides:

> [A]ction items for the implementation of [the redevelopment district] include acknowledgment of appropriations to be made to fund the phases set forth in the SWA Preliminary Cost Study . . . through placement of the projects in the City's 5-year Capital Projects Plan and adoption in the City Council's appropriate annual budget.

City Exhibit 24 at 49.  SWA's short term recommendations are included as Appendix B to the proposed umbrella ordinance and show a total short term potential South Bossier investment in the amount of $3.621,116.  See id. at 53.  The mid term and long term recommendations are likewise included with potential investments totaling $567,080 and $930,200, respectively.  See id. at 54.  The total potential South Bossier investment listed as part of the proposed ordinance is $5,118,396.  See id. at 55.

The Court was also impressed by the testimony of Mark Hudson ("Hudson"), City Engineer.  Hudson testified that he deals with the requests for funding of particular projects the City is going to undertake:

> As projects are identified that the City wants to have designed or constructed, it's not uncommon for me to calculate a budget number to be used to accomplish that project and go to the city council to have the money appropriated, typically via an ordinance.

Record Document 518 at 339.  He explained that there is also a calendar year budgeting process and that the City has to put funds in an annual budget for infrastructure projects.

See id. Hudson testified that he had seen the SWA Conceptual Redevelopment Plan and that his focus had been the short term projects relating to landscaping and hardscaping down Highway 71.  See id. at 343-344.  As to $300,000 appropriated to redevelopment in the 2015 City budget, Hudson explained that in an effort to "jumpstart the third leg of the agreement, the redevelopment projects – I dreamt up the 300 grand." Id. at 345.  Hudson believed it "would show some good faith that [the City was] moving on to the third leg of the agreement." Id. Hudson outlined the $1.6 million appropriated for redevelopment in 2016 budget and stated that the total cost of recommended projects by SWA in the first five years is $3.6 million.  See id. at 349-350.  The balance of $1.7 million, after the $1.9 million allocated in 2015-2016, would then be put in the five-year capital plan.  See id. at 355-356.

At this stage of redevelopment, the Court finds that the funding mechanisms in place are in line with best planning guidelines and practices.  Moreover, the City's response explaining the limitations of TIF funding; the specific incorporation of the short term, mid term, and long terms recommendations and the cost study numbers in the proposed umbrella ordinance; and the credible testimony of Hudson as to the City's budgeting process demonstrate good faith on the part of the City in its funding commitment.

### d.    Implementation Schedule.

In his matrix, Meyer stated that the City needs to commit to a time frame to create and formally adopt the needed regulations, district committee, the redevelopment district(s) and capital improvements.  See Coleman Plaintiffs' Exhibit 3.  Meyer contends that the Implementation Plan's schedule is insufficient to allow the Redevelopment Districts to function properly.

The Court believes that the proposed umbrella ordinance resolves many, if not all, of Meyer's critiques of the implementation schedule.   The ordinance creates the

redevelopment districts and the district committee.  See City Exhibit 24 at 48-55.  The ordinance, along with Hudson's testimony, outlines the City's commitment to complete the short term recommendations within a five year time frame.  See id.; see also Record Document 518 at 349-350, 355-356.  In an email to McSwain, Meyer stated that "it was never [SWA's] intent that all of the recommendations be implemented all at once."  City Exhibit 9.  Meyer admitted that prioritization would be up to the City and that a phased implementation strategy, wherein the City phases projects in as funds are available from year to year, was the intent of the SWA plan.  See id.  In fact, there was much testimony at the hearing describing a phasing of capital projects and incremental changes over time. Thus, given this reasoning and again noting the early stages of redevelopment, the Court holds that the implementation schedule is in line with best planning guidelines and practices.[25]

_____

[25]In their motion, the Coleman Plaintiffs had questioned the self regulation of the Barksdale South Neighborhood Redevelopment District.  Meyer, in his matrix, suggested that the City "replace self-regulation with a City or MPC driven process that uses internal planning professionals or consultants to draft an overlay plan, present it to the residents and gather feedback and comments prior to adoption."  See Coleman Plaintiffs' Exhibit 3. However, there was little testimony on this issue at the hearing.

In its August 21, 2015 response, the City noted that the proposed umbrella ordinance "calls for role by City government under leadership of Bossier MPC (subject to adding needed MPC staff or outside consultants) in:

c.      Supporting neighborhood in its adoption of self-regulation under the proposed Neighborhood Conservation Overlay to be considered under Sec. 5.7.3 of the Bossier Unified Development Code. . . . Note: By adoption of the new Ordinance, the . . . City Council proactively is nominating the Barksdale South Neighborhood for contact and discussion by the Bossier MPC through MPC Planner Carlotta Askew-Brown for initiation of adoption of a Neighborhood Conservation Overlay district(s) as provided in the Implementation Plan.  The adoption of the new Ordinance amends Sec. 5.7.3 of the UDC as necessary to authorize this nomination by the City Council.

City Exhibit 24 at 30.  The Court finds that the City's response and the changes made

III.     **CONCLUSION.**

Based on the foregoing analysis, the Court **DENIES** the Coleman Plaintiffs' Motion to Enforce Consent Decree and Cooperative Endeavor Agreement (Record Document 475), including their request for attorneys' fees and the costs incurred for the utilization of land use planning experts.  The stay entered as to all action on the redevelopment districts is hereby **LIFTED**.

The Court hopes that the resolution of the issues presented in the instant motion will facilitate a better working relationship between all parties moving forward.  The Court believes that while there was no breach of the Consent Decree or the CEA by either party, there is room for improvement in the working relationship between the City and the Coleman Plaintiffs.  At the time of the hearing, the Court noted that there were no biddable documents relating to the Walker Place Development.  The Court hopes that the Coleman Plaintiffs will be diligent and expeditious in working on the development documents, as required by Section C(1)(D) of the Consent Decree.  Likewise, the City is encouraged to move forward with its redevelopment efforts in a prompt manner such that the citizens of South Bossier receive the community benefits intended by the CEA.

An order consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 13th day of March, 2017.

_S. Maurice Hicks/_

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE

_____

evidence consultation, in good faith and in full cooperation, and also are in line with best planning guidelines and practices.